The State v. Nash.

---

No. 23,639.

The State of Kansas, *Appellee*, v. W. C. Nash, *Appellant*.

SYLLABUS BY THE COURT.

1. Criminal Law—*Obtaining Property by False Pretenses*. While the statute providing for punishment of false pretenses (Gen. Stat. 1915, § 3467) does not cover that form of dissembling known as "puffing," a false representation, designedly made to cheat and defraud and having that effect, is a false pretense.

2. Same—*Investigation of Truth of False Representations*. One to whom false representations are made is under no obligation to institute an independent investigation of the truth of the representations.

3. Same—*False Pretenses—Expression of Opinion—Assertion of Values—Questions for Jury*. Generally, an expression of opinion, understood to be such, is not a false pretense. Whether or not an assertion of value is to be regarded as an expression of opinion, depends on circumstances. If made with the design that it shall be accepted and acted on as a statement of existing fact, it may be so regarded. Whether or not it should be so regarded, is a question for the jury.

4. Same—*False Pretense—Reliance Upon the False Representations*. In a prosecution for false pretense, absurdity of the representations charged may be relevant to the question whether the complainant relied on them and was deceived, but absurdity is no defense if, other elements of the offense being present, the complainant was deceived.

5. Same—*Evidence of Similar False Representations Made to Others*. The rule permitting evidence of similar false representations to be introduced in a prosecution for false pretense, does not require the evidential representations to be precisely the same as the pretense charged.

6. Same—*Certain Assignments of Error Without Substantial Merit*. Assignments of error relating to refusal to quash the information, admission in evidence of similar false pretenses, instructions refused, instructions given, sufficiency of the evidence to sustain the verdict, and other subjects, considered, and held to be without substantial merit.

Appeal from Rice district court; Daniel A. Banta, judge. Opinion filed February 11, 1922. Affirmed.

*John Madden, John Madden, jr.,* and *C. B. Dunn,* all of Wichita, for the appellant.

*Richard J. Hopkins,* attorney-general, *Ben Jones,* county attorney, and *L. E. Quinlan,* of Lyons, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The defendant was convicted of obtaining property by means of fraudulent representations, and appeals.

The defendant is a stockbroker, who lives in Wichita. In October, 1920, he went to Rice county, and called on persons owning Kansas Casualty and Surety Company stock. Near Sterling he interviewed F. L. Matthews and Ben Harrison. At Sterling he called on Mrs. Lillian Coleman. Going from Sterling to the vicinity of Bushton, he made a trade for Albert J. Van Cleave's Casualty Company stock. At Bushton he interviewed Bert C. Shonyo. The Kansas Casualty and Surety Company was a Wichita company. Its stock had paid no dividends for several years, and there was testimony that it was worth from five to eight dollars per share. To each of the persons named the defendant offered to trade Stanley-Jones Royalty units for Casualty Company stock. The Stanley-Jones Royalty consisted of one-sixteenth of the oil production of 320 acres of land in the Elbing-Peabody field, for which the promoters paid ·$120,000. Twelve wells were drilled on the land. One was a dry hole; one made a showing of oil; nine were producing wells; one might be regarded as a producing well. By October, 1920, the wells had gone down to small production. It was necessary to erect treating tanks and steam the oil, on account of presence of water. The Royalty was divided into 480,000 units, without par value, and worth on the market, in October, 1920, between twelve and one-half and twenty or twenty-five cents per unit. Bulletin No. 15 of the Royalty, announcing payment of dividend for the period, July 15 to September 15, 1920, gave the dividend as .003. The amount of the dividend was $1,440. The number 1,440 is .003 of the number 480,-000. Of course dollars and unvalued royalty units cannot be stated in percentages of each other; but if the 480,000 units be regarded as worth one dollar each, the total dividends paid from about June, 1919, to October 1, 1920, amounted to 10.25 per cent.

Van Cleave is a bachelor, sixty-seven years old at the time of the trial, who lives on a farm, but has retired from active farming. About sundown on October 28, 1920, the defendant arrived at Van Cleave's farm, in a closed car. Van Cleave recognized the defendant as the man who sold him 250 shares of Casualty Company stock six years before. The defendant said he was sorry he had sold Van

Cleave the Casualty Company stock, and was there to try to help him get his money out of it. Van Cleave knew nothing about Stanley-Jones Royalty but, relying on the defendant's representations concerning it, traded his Casualty Company stock for 2,875 units of the Royalty. According to the defendant's story, he did not sell the Casualty Company stock to Van Cleave. Van Cleave was well informed concerning the Royalty, pressed the defendant to take Casualty Company stock for Royalty units, would not wait to read bulletin 15 by the defendant's flashlight, and within a few minutes had succeeded in getting his Casualty Company stock into the defendant's hands, on the defendant's promise to send a certificate for 2,875 units of the Royalty.

The information charged false representations made to Van Cleave whereby he was induced to part with his property, which may be stated, and for convenience may be numbered, as follows:

1. Casualty Company stock was practically worthless.

2. The Casualty Company had reduced the lines of risks it had been writing from eleven to three.

3. 2,875 Royalty units were of the reasonable value of $5,750.

4. The entire Stanley-Jones Royalty was divided into 100,000 units.

5. There were ten paying oil wells on the lease from which the Royalty was derived.

6. There was room for many more wells on the lease.

7. The Royalty was paying 7 per cent per month on each unit.

8. The Royalty had paid a like amount for some months previous to October 28, 1920.

9. The par value of each Royalty unit was two dollars.

10. The oil wells on the lease were good wells.

11. There was no water trouble in the Elbing-Peabody oil field in which the lease was located.

Van Cleave testified the defendant told him the Casualty Company stock was very nearly worthless; the company was talking of cutting down the capital stock 50 per cent; the company had originally carried eleven lines of risk, but were then writing only three; it looked as if the company was going to the bad; the defendant had sold his own Casualty Company stock at a loss, and was trying to befriend Van Cleave. The Royalty units were selling for two dollars per unit, and the defendant put a value on the 2,875 units of 5,700 and some dollars. The defendant said there were ten producing wells on the lease, and there was room for ninety more wells. The Royalty was paying, and had been paying, 7 per cent per month on

The State v. Nash.

each unit. The par value of each unit was one dollar. The witness took it for granted the wells were good wells. Nothing was said about water trouble, and the witness made no mention of the number of units into which the Royalty was divided.

From the foregoing summary it appears the charge that representations 1, 2, 3, 6, 7, and 8 were made, was fairly sustained. Van Cleave testified he relied on the defendant's statements in exchanging his Casualty Company stock for Royalty units. When cross-examined for specific statements on which he depended, he mentioned particularly the statement that the Royalty was paying 7 per cent per month, and testified the defendant said he would have his money all back inside of eight months.

Matthews, Harrison, Mrs. Coleman and Shonyo were called as witnesses for the state. To Matthews the defendant said he had some Stanley-Jones Royalty which he would trade for the witness' Casualty Company stock, and in the conversation the defendant made representations 2, 4, 9, and 11. The defendant said there were three producing wells on the Royalty lease, and room for many more. The Royalty was paying 1 per cent per month on each unit. The Casualty Company was not doing any business, hardly, and its stock was worth five or six dollars per share on the market. To Harrison the defendant said he had a contract to get so many shares of Casualty Company stock, and when he got that many he did not want any more. The Casualty Company was about "busted," and was going to make an assessment of 50 per cent. The defendant would give $5.50 per share for the stock. There were ten producing wells on the Royalty lease. The units were worth two dollars, and were paying 7 per cent per year on the dollar. The defendant said the Royalty was divided into 100,000 units, and they were not troubled with water in the Peabody field. When talking to Harrison about the dividends the Royalty was paying, the defendant had in his hand a typewritten bulletin, and he figured the amount from figures on the bulletin. The defendant offered to trade Stanley-Jones Royalty to the witness for his Casualty stock. Mrs. Coleman's recollection was vague, and her testimony was unimportant. To Shonyo the defendant offered to exchange Royalty units for Casualty Company stock, and made representations 4, 7, and 11. The defendant said the Casualty Company was in bad shape, and was going to cut down the stock 50 per. cent. The stock was selling at $5.50 per share. The Royalty units were of the value of two dollars

per unit, the par value being much less. The Casualty Company stock had not been paying dividends, and one of the things the witness wanted to know, if he traded, was what dividends the Royalty was paying.

The testimony given by the defendant and his witnesses contradicted the testimony of the state's witnesses in respect to all matters essential to conviction and, if believed by the jury, would have exculpated the defendant.

A motion was made to quash the information, on grounds patently untenable. The information charged a public offense, under the statute relating to false pretenses. It was specific, definite and certain respecting the offense charged, the party charged, and the intent charged. It separately and specifically pleaded falsity of each representation charged as having been made. It did not contain repugnant or inconsistent allegations, and it plainly informed the defendant of what he would be obliged to meet. But one offense was stated, committed by a single means, and it was neither necessary nor proper to devote a separate count to each false pretense.

The statute reads as follows:

"Every person who, with intent to cheat or defraud another, shall, designedly, by means of any false token or writing, or by any other false pretense, obtain the signature of any person to any written instrument, or obtain from any person any money, personal property, right in action, or any other valuable thing or effects whatsoever, upon conviction thereof shall be punished in the same manner and to the same extent as for feloniously stealing the money, property or thing [so] obtained." (Gen. Stat. 1915, § 3467.)

The defendant discusses the policy of the statute. He contends that in this commercial age of stocks and bonds and blue-sky securities, salesmen ought to be perfectly free to exaggerate desirability of what they want to dispose of, and to disparage desirability of what they want to get, without any liability for consequences of their utterances; the rule of *caveat emptor* ought to apply quite strictly to farmers like Van Cleave when dealing with stockbrokers; and the defendant is exercised lest the revenues of the state be exhausted in building jails, if common honesty be enforced in business transactions. (See, 11 R. C. L. 829.) This court's attitude toward the form of dissembling known as "dealer's talk" was expressed in the opinion in the case of *Foote v. Wilson*, 104 Kan. 191, 178 Pac. 430. However detestable it may be, mere "puffing" is not reached by the statute. The statute, however, does reach false pretense,

and a false representation, designedly made to cheat or defraud, and having that effect, is a false pretense, within the meaning of the statute. (*The State v. Terrill,* 87 Kan. 745, 125 Pac. 65.) A person in Van Cleave's situation is under no obligation to make an independent investigation. He may rely on statements made to him as statements of fact, as being true. Should he do so to his injury, the doctrine of *caveat emptor* cannot absolve the pretender. If this interpretation of the statute should overcrowd the penitentiary with a tribe of conscienceless salesmen who think it smart to deceive, the people of the state will bear up, notwithstanding hard times and high taxes. Meanwhile, there will be abundant opportunity for sincere men to render honest service in the stock, bond, and oil-royalty business.

The defendant says the statute does not cover expressions of opinion, and that representations 1 and 3 were merely expressions of opinion. Generally, an expression of opinion, understood to be such, is not a false pretense. Whether or not an assertion of value is to be regarded as an expression of opinion or a statement of fact, depends on circumstances. If a farmer were to ask a grain dealer what wheat is worth to-day, the answer would not express an opinion. If the grain dealer were to ask the farmer what his farm is worth to-day, the answer would express an opinion. In one instance, value would be understood to be known market price; in the other, the elements of value would be so numerous and varied that farmers and real-estate men would differ in their estimates, and necessarily no more than an opinion could be expressed. (*Subke v. Gonder,* 97 Kan. 414, 419, 155 Pac. 793.) In any case, however, a statement of value may be made with the distinct purpose that it shall be accepted and acted on as a statement of existing fact. Should the purpose succeed, the person making the statement cannot fall back on the opinion rule when prosecuted for false pretense. Whether a statement is one of fact or one of opinion, in the sense indicated, is a question for the jury. (*Williams v. State,* 77 Ohio St. 468, and authorities cited in the opinion; 25 C. J. 597; Case Note, 14 L. R. A., n. s., 1197.)

The defendant presented to the district court in various ways, and argues here, the subject of absurdity of representations. The better rule is that absurdity and irrationality may be considered by the jury as bearing on the question whether the complainant relied on the representations and was deceived, and perhaps as bearing on

the question whether the defendant intended to deceive. If, however, these questions be determined against the defendant, other elements of the offense being present, it is sufficient that the complainant was deceived. (*The State v. Chance,* 82 Kan. 388, 390, 108 Pac. 789; 25 C. J. 598; Note, L. R. A. 1916 C, 1104.) The subject, however, is of no importance in this case, because none of the representations charged as having been made was irrational or absurd. The statements in reference to Casualty Company stock were believable. Great fortunes are so often made in the oil business in Kansas that the representations concerning the Stanley - Jones Royalty indicated it belonged to a comparatively moderately remunerative class of investment. When the Royalty was organized the prospects were that units would be of much greater value and would pay much higher dividends than the defendant represented to Van Cleave. One of the wells produced 4,200 barrels of oil per day, and was the largest in that field. In proved territory the practice is to drill eighteen wells on each 80 acres, so that normally the tract from which the Royalty was produced would sustain 72 wells. The difficulty was, the oil sand proved to be but a few feet in thickness, and each new well simply offset those already drilled.

The defendant complains because the court admitted the testimony of Matthews, Harrison, and Shonyo. The argument is this: The rule admitting evidence of other pretenses contemplates similar pretenses; the word "similar" is derived from the Latin word "similis," and means precisely alike, exactly corresponding, resembling in all respects; therefore, unless the defendant said to the witnesses the identical things he said to Van Cleave, their testimony was inadmissible. The defendant evidently consulted an old dictionary, and did not read far enough in the one he did consult. Formerly, the primary meaning of "similar" was that expressed in the defendant's definition. Long ago, however, approved usage sanctioned a meaning indicating somewhat of likeness. (Webster's Unabridged Dictionary, ed. 1879.) Later the word lost its original primary signification, and it is now used in virtual contradistinction to exact likeness: "Nearly corresponding; resembling in many respects; somewhat like; having a general likeness." (Webster's New International Dictionary.) In a particular instance, context may indicate likeness to the degree of identity, but generally partial resemblance only is meant. (Century Dictionary; Black's Law Dictionary; Bouvier's Law Dictionary, Rawle's 3d Rev.)

If the word "similar" bore the meaning for which the defendant contends, the rule would be stated without using it, because it is not essential that evidential representations be precisely the same as the pretense charged. The nature of the transactions in which representations were used is looked to, and it is sufficient if the evidential transactions resemble the offense charged in general outline, although differing in details, including representations. (*The State v. Mathes,* 108 Kan. 488, 491, 196 Pac. 607; 25 C. J. 649.)

The defendant says false pretenses must be relied on. The court so directed the jury. The defendant says, however, Van Cleave was not moved to part with his property because of the defendant's statements. Van Cleave testified to the contrary. His testimony was competent proof of the fact (*The State v. Hetrick,* 84 Kan. 157, 113 Pac. 383), and the jury has decided the matter.

A requested instruction that the jury might consider Van Cleave's precaution or lack of precaution in ascertaining conditions affecting the value of property the subject of exchange, was properly refused, and the court properly advised the jury Van Cleave was not bound to investigate the truth or falsity of what the defendant said, but was privileged to rely on the truthfulness of the defendant's representations.

Requested instructions to the effect that the statute deals only with transactions so flagrant, shifty and deceptive as to deceive an ordinarily prudent person, and embodying the defendant's notions of absurdity and of *caveat emptor,* were properly refused, for reasons which have been indicated.

The court correctly limited the term "false pretense" to false representation of an existing fact or of a past fact, and carefully distinguished opinions relating to value, opinions looking to the future, and promises looking to the future, by instructions which are not complained of. This being true, use of the expression "material averments alleged in the information" was not misleading in an instruction relating to the extent of proof necessary to warrant conviction. The instruction was based on the decisions of this court in the cases, *The State v. Hetrick,* 84 Kan. 157, 113 Pac. 383, and *The State v. Terrill,* 87 Kan. 745, 125 Pac. 65.

An instruction that the coupling of expressions of opinion with false representations does not relieve from responsibility for the representations, was properly given. (*The State v. Terrill,* 87 Kan. 745, 125 Pac. 65.)

In a categorical statement of the elements of the offense charged the court instructed the jury that before the defendant could be convicted it was necessary for the state to prove, beyond reasonable doubt, that the defendant made to Van Cleave the false representations charged, or some material part of them. This being true, there is no foundation for the assertion that in an instruction relating to moving cause for parting with property it was assumed as a fact that the defendant did make false representations.

The court gave an instruction properly stating the purposes for which evidence of other representations was admitted, and properly limited the use to be made of such evidence. A complaint that the instruction failed to express the defendant's doctrine of similarity, need not be discussed. The defendant's real complaint is this: There were ten producing wells on the land from which the Royalty was derived. The Royalty was paying nearly 1 per cent per month. The Casualty Company stock was nonproductive, and the company had discontinued writing three kinds of risk. The defendant testified he did make substantially these statements. According to the witnesses for the state, the defendant made widely different statements about the same subject, as, for example, royalty dividends, when there was no reason for his doing so. This indicated faulty memory, or indicated the defendant was misunderstood. Only a few of the representations charged in the information as made to Van Cleave were made to him, and nearly all the representations which the testimony indicated were made to others, were not made to Van Cleave. In this state of the evidence, which the jury probably did not carefully analyze, the defendant may have been convicted of defrauding Van Cleave by representations which he did not make to Van Cleave.

The jury were warranted in believing the defendant set out to gather up Casualty Company stock then in the hands of Rice county holders, by trading Royalty units for it. Both stock and royalty were stale, but there was profit in making an exchange on advantageous terms. There was evidence that, to gain his ends in prosecution of that enterprise, the defendant habitually misrepresented material facts to persons whom he approached. The jury were compelled to determine, from conflicting testimony, whether or not intentional falsehood characterized the defendant's conduct, and it is outside the province of this court to debate that subject. The defendant's method of dealing with Matthews and Harrison

and Shonyo illuminated with strong light the method of dealing with Van Cleave. The rule of law recognizing similar pretenses as relevant and material is simply jural recognition of what common experience proves to be true. The court told the jury the defendant should be convicted, if at all, for representations made to Van Cleave, and explained to the jury the bearing on the question of guilt of representations made to others. In criminal cases, argument of counsel is allowed, in order that evidence may be adequately analyzed for the benefit of the jury. Presumably, counsel for the defendant made clear to the jury just what representations charged as having been made to Van Cleave were not made to him, and pointed out those representations testified to by others which were not made to Van Cleave. The district court reviewed the proceeding, on motion of the defendant for a new trial, and approved the verdict. Under these circumstances, this court is not authorized to say that the jury misconceived or misapplied the evidence or misapplied the law.

Some minor subjects of complaint—no copy of the certificate of Royalty units attached to the information, indorsement of names of witnesses on the information at the trial, and omission to prove the Casualty Company was a corporation—and some ramifications of the argument in the defendant's brief and supplemental brief have been considered, and are not deemed of sufficient importance to require further extension of this opinion.

The judgment of the district court is affirmed.