. No.' 21,862.

JAMES E. FOOTE, *Appellee,* V. LESLIE C. WILSON and JOSEPH P.
WILSON, Partners as THE WILSON MERCANTILE COMPANY,
*Appellants,* THE BANK OF PLEASANTON, *Appellee.*

SYLLABUS BY THE COURT.

1. SALE—*Stock of Merchandise—Representations—Statement of Fact.*
A statement made to the buyer by the seller of a stock of merchandise,
that the goods were salable, was a statement of fact, salable being the
equivalent of merchantable, which means, in such a transaction, fit for
sale in usual course of trade, at usual selling prices.

2. SAME. A statement made to the buyer by the seller of a stock of
merchandise, that the goods would invoice at from $9,000 to $11,000,
was a statement of fact, and not a mere expression of opinion respect-
ing value.

3. SAME—*Inspection—Buyer's Right to Rely on Statements Made.* The
buyer might rightfully rely on the statements referred to, although the
stock of merchandise was freely and fully exposed to his inspection and
he did make a partial inspection.

4. SAME—*Statements of Facts—Warranties.* Statements of material
facts of the kind referred to, which tend to induce a sale of goods, and
which are relied on by the buyer, are, for all practical legal conse-
quences, warranties.

Appeal from Linn district court; EDWARD C. GATES, judge.
Opinion filed February 8, 1919. Affirmed.

*A. M. Keene,* of Fort Scott, for the appellants.
*John A. Hall,* of Pleasanton, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by a buyer to rescind a con-
tract of sale induced by false statements of the seller, and for
other relief. The seller prayed for specific performance. The
plaintiff recovered, and the defendants appeal.

The transaction was typical of that form of industry which
consists in assembling worthless odds and ends of stocks of
goods, giving the aggregation the appearance of a "store," and
selling it to a farmer. The details vary according to the in-
genuity of the seller. In this instance the store was opened
wide to the farmer's inspection. He was led along shelves and

showcases, and behind counters. Covers were removed and boxes were opened, and he saw straw hats (the sale was made in November), and narrow-width, pointed-toed, low shoes, and rotten rubber goods, and soiled white goods, and out-of-date styles. Discovering a moth-eaten garment, he modestly inquired if it were salable, and was assured that it was, and was told by one of the defendants that his method was not to put the price down, like some people, but always to put it up— he had been a merchant for forty years, and always sold his goods. The plaintiff brought his wife in from the farm to look at the store. He also took to the store a merchant from a neighboring town, who spent approximately forty-five minutes in examining the stock, and who gave the plaintiff little information and no advice. On three different occasions the plaintiff spent a total of two and a half or three hours looking, with uncomprehending eyes, at the goods, before trading his homestead and another farm for them, without an invoice. An agent of the defendants urged him to trade quickly, without an invoice, because an invoice would show so much more than the defendants claimed, they would back out. The plaintiff testified that he was without experience, that he did not make a thorough examination because of the representations of the defendants and their agent, and that when he finally made up his mind to trade, he did so, not on his own judgment, or the judgment of the merchant he called to his assistance, but because he relied on the statements of the defendants and their agent respecting the quality and quantity of goods in the store. Those statements were that the goods were salable goods, and that they would invoice from $9,000 to $11,000. The plaintiff was placed in possession. When he tried to sell the stuff, nobody would buy, and when he took an inventory, it amounted to about $2,500.

So-called "dealers' talk," of the kind the courts are called on to consider, is morally reprehensible because it is intended to produce the psychological effect of representation without incurring the penalties of represenation. Tradesmen of the better class scorn to resort to it. They understand that what we need in business, as well as in social, political, and even international relations, is common honesty of speech, and they depend for success on serving the public needs, telling the truth

about their commodities, and standing ready to make good their assertions. A few dealers still cling to the double standard of morals—one for church on Sunday, and one for business on week days. They display raucous mirth at the "sentimental" notion that men are their brothers' keepers in business, and that the golden rule applies to the relation between buyer and seller, and they exercise in full the privilege of trimming with luring "opinions," seductive "puffing," and shrewdly equivocal "shop talk," still permitted them by the remnant of the discredited doctrine of *caveat emptor,* "The dark-age law of *caveat emptor!*" (84 Cent. L. J. 63) which still survives. Shocking as it appears, the law of sales is still of such low-grade morality that it sends the public to its tradesmen on the basis that people should expect to meet and be deceived by the expert use of a lingo on ethical par with that of horse traders, unless they be wary enough to protect themselves.

When the limits of the refined form of prevarication known as "dealers' talk" have been overstepped, and in an unguarded moment a material fact has been stated, the law does step in and protect the buyer. In this instance one deceitful representation was that the goods were salable. The representation was one of fact. Salable is the equivalent of merchantable— the sonorous bait employed in the case of *Miller v. Thayer,* 101 Kan. 355, 168 Pac. 277—which in all the dictionaries and to the common understanding means, as applied to commercial transactions, fit for sale in usual course of trade, at usual selling prices. The other representation, that the goods would invoice at from $9,000 to $11,000, was likewise a positive assertion of a definite fact, and not a mere expression of an "opinion respecting value."

The attorney for the defendants concedes, with becoming candor, that the defendants are bound by the finding of the district court relating to the representations alleged to have been made, but he directs attention to the admissions of the plaintiff that he not only had abundant opportunity for inspection, but that he inspected the goods himself as long and as often as he desired, and that he had others inspect them. Besides this, he took a bill of sale which contained no warranty respecting salability or amount of invoice. Authorities are

13—104 KAN.

cited to the effect that the rule of *caveat emptor* ordinarily applies to a sale for general purposes of common articles of merchandise open to inspection; that means of knowledge is the equivalent of knowledge; that a buyer cannot be heard to say he relied on representations as to facts when the facts themselves were before his eyes; and that a buyer distrustful of his own judgment should take a warranty.

The authorities cited are either inapplicable to the facts, or else they do not represent the best modern legal thought. The defects of which the buyer complains were not obvious, that is, they were not apparent on casual observation. An examination was required. A brief examination might have been sufficient to satisfy an expert dealer, familiar with the capacity and disposition of the public to absorb such goods, but investigation was necessary. The buyer made a partial investigation. The seller might have kept silent, had he so desired, and might have allowed the buyer to improve or not, as he desired, his opportunity for investigation. The seller, however, chose not to keep silent. He not only made profert of the goods for inspection, but he made profert of his own statements of fact, for such weight as they might have. The buyer accepted the statements as true, and acted on them. Under such circumstances the seller is bound by his statements. He cannot insist that the buyer be held to the results of an inspection made, or which might have been made, because he was not content to leave the buyer to abide by such results. He induced the sale by other means, and will not be heard to say that such other means ought not to have prevailed.

In this instance the buyer was conscious of his limitations, and consequently was all the more ready to accept the seller's statements and forego full inspection and an invoice. The law does not recognize any confidential relation between buyer and seller, and has no concern for gullibility as such. But the natural tendency of the uninstructed human mind, sailing off its course in strange seas, to accept expert guidance, may well have been taken into account by the trial court in determining whether or not genuine reliance was placed on the seller's representations; and the law does not permit the seller who has influenced the navigation to his own advantage by means of his own false statements, to say that the buyer had better

Foote v. Wilson.

light to steer by. A good discussion of the subject may be found in section 208 of Williston on Sales.

Under certain circumstances, the distinction between representation and warranty may well be regarded, but in the transaction under consideration it is of no practical consequence. It affects neither the buyer's right nor the buyer's remedy. Whatever else entered into the transaction, a vital part of it was an affirmation by the seller of material facts which tended to induce the sale, and which were relied on by the buyer. When a sale has been accomplished by such means, it is purely formal and theoretical to say that the affirmation did not become an element of the contract of sale itself, and so constitute a warranty. Such an affirmation is a warranty (Williston on Sales, § 197), and in this instance it is not material that the affirmations which the defendants made were not repeated in the bill of sale, which did not embrace the subject of warranty.

The parties entered into a preliminary written contract, which provided the manner in which the sale should later be fully consummated. The buyer was to have possession, but the money received from the sale of goods was to be kept intact, and the entire transaction was to be finally concluded within thirty days. In the preliminary contract, which was dated November 16, the defendants agreed to give a bill of sale of the merchandise "as it is to-day." The bill of sale which was executed was dated November 16, and did not contain the quoted limitation. It is suggested that the limitation was intended to exclude warranty of quality and quantity. Very clearly it had no such purpose or effect.

The judgment of the district court is affirmed.