ULTRAMARES CORPORATION, Appellant and Respondent,
  *v.* GEORGE A. TOUCHE et al., Copartners under the
  Firm Name of TOUCHE, NIVEN & COMPANY, Respondents and Appellants.

(Argued December 3, 1930; decided January 6, 1931.)

*Herbert R. Limburg, Martin Conboy, David L. Podell, Joseph L. Weiner* and *Lionel S. Popkin* for plaintiffs, appellants and respondents. Defendants are liable to plaintiff for the loss occasioned by defendants' negligence. (*Glanzer* v. *Shepard,* 233 N. Y. 236; *International Products Co.* v. *Erie R. R. Co.,* 244 N. Y. 331; *Doyle* v. *Chatham & Phenix Nat. Bank,* 253 N. Y. 369; *Cole* v. *Vincent,* 229 App. Div. 520; *Eaton, Cole & Burnham Co.* v. *Avery,* 83 N. Y. 31; *Bank of Batavia* v. *N. Y., Lake Erie & Western R. R. Co.,* 106 N. Y. 195; *Carpenter* v. *Blake,* 75 N. Y. 12; *MacPherson* v. *Buick Motor Co.,* 217 N. Y. 382; *Junkermann* v. *Tilyou Realty Co.,* 213 N. Y. 404; *Statler* v. *Ray Mfg. Co.,* 195 N. Y. 478.) The identity of the borrower need not be known in advance. (*Eaton* v. *Avery,* 83 N. Y. 31; *Ottinger* v. *Bennett,* 144 App. Div. 525; 203 N. Y. 554; *Bystrom* v. *Villard,* 175 App. Div. 433; 188 App. Div. 964; 230 N. Y. 588; *Downey* v. *Finucane,* 205 N. Y. 251; *Brackett* v. *Griswold,* 112 N. Y. 454; *Kujek* v. *Goldman,* 150 N. Y. 176.) The court erred in dismissing the fraud cause of action. (*Matter of City of*

*New York*, 224 N. Y. 454; *Fifth Avenue Bank* v. *42d St. & Grand St. Ferry*, 137 N. Y. 231; *Gleason* v. *Seaboard Airline Ry. Co.*, 278 U. S. 349; *Lloyd* v. *Grace*, [1912] A. C. 716; *Hanover Bank* v. *American Dock & Trust Co.*, 148 N. Y. 612; *Jarvis* v. *Manhattan Beach Co.*, 148 N. Y. 652; *Nowack* v. *Metropolitan St. Ry. Co.*, 166 N. Y. 433.) The assertion that defendants had made a reasonably careful audit was an assertion of fact for which the defendants are liable even if defendants believed that such audit had been reasonably carefully made. (*Ottinger* v. *Bennett*, 144 App. Div. 525; 203 N. Y. 554; *Bystrom* v. *Villard*, 175 App. Div. 433; 188 App. Div. 964; 230 N. Y. 588; *Hadcock* v. *Osmer*, 153 N. Y. 604; *Churchill* v. *St. George Development Co.*, 174 App. Div. 1; *Kuelling* v. *Lean Mfg. Co.*, 183 N. Y. 78; *Downey* v. *Finucane*, 205 N. Y. 251.)

*Samuel Untermyer, John W. Davis* and *James Marshall* for defendants, respondents and appellants. The defendants were under no duty to the plaintiff to use care in the preparation of the balance sheet, and their negligence, if any, gives rise to no cause of action in favor of the plaintiff. (*Palsgraf* v. *Long Island R. R. Co.*, 248 N. Y. 339; *Landell* v. *Lybrand*, 264 Penn. St. 406; *Jaillet* v. *Cashman*, 115 Misc. Rep. 383; 202 App. Div. 805; 239 N. Y. 511; *Seneca Wire, etc., Co.* v. *Leach*, 247 N. Y. 1; *Weld-Blundell* v. *Stevens*, [1920] A. C. 956; *Derry* v. *Peek*, [1889] 14 A. C. 337; *Glanzer* v. *Shepard*, 233 N. Y. 236; *MacPherson* v. *Buick Motor Co.*, 217 N. Y. 382; *Savings Bank* v. *Ward*, 100 U. S. 195; *Matter of Cushman*, 95 Misc. Rep. 9; *Thomas* v. *Guarantee Title & Trust Co.*, 81 Ohio St. 432; *Day* v. *Reynolds*, 23 Hun, 131; *Glawatz* v. *People's Guarantee Search Co.*, 49 App. Div. 465; *National Iron & Steel Co.* v. *Hunt*, 312 Ill. 245; *Le Lievre* v. *Gould*, [1893] 1. Q. B. 491; *Heaven* v. *Pender*, [1883] L. R. 11 Q. B. D. 503; *Kahl* v. *Love*, 37 N. J. L. 5; *Moch Co.* v. *Rensselaer Water Co.*, 247 N. Y. 160; *Robins Dry Dock & Repair Co.* v. *Flint*, 275 U. S. 303.) The fraud

cause of action was properly dismissed. (*Deyo* v. *Hudson*, 225 N. Y. 602; *Henry* v. *Allen*, 151 N. Y. 1; *Credit Alliance Corp.* v. *Sheridan Theatre Co.*, 241 N. Y. 216; *Martin* v. *Gotham Nat. Bank*, 248 N. Y. 313; *Reno* v. *Bull*, 226 N. Y. 546; *Kountze* v. *Kennedy*, 147 N. Y. 124; *Ellis* v. *Andrews*, 56 N. Y. 83; *Van Slochem* v. *Villard*, 207 N. Y. 587; *Mecum* v. *Mooyer*, 166 App. Div. 793; *Barr* v. *Sofranski*, 130 App. Div. 783; *Morris* v. *Talcott*, 96 N. Y. 100.)

*Roger S. Baldwin, J. Harry Covington* and *Kenneth McEwen* for American Institute of Accountants, *amicus curiæ*. There is no liability without either privity of contract or direct relationship. (*MacPherson* v. *Buick Motor Co.*, 217 N. Y. 382; *P. G. Poultry Farm* v. *Newtown B.-P. Mfg. Co.*, 248 N. Y. 293; *Glanzer* v. *Shepard*, 233 N. Y. 236; *International Products Co.* v. *Erie R. R. Co.*, 244 N. Y. 331; *Doyle* v. *Chatham & Phenix Nat. Bank*, 253 N. Y. 369.)

CARDOZO, Ch. J. The action is in tort for damages suffered through the misrepresentations of accountants, the first cause of action being for misrepresentations that were merely negligent and the second for misrepresentations charged to have been fraudulent.

In January, 1924, the defendants, a firm of public accountants, were employed by Fred Stern & Co., Inc., to prepare and certify a balance sheet exhibiting the condition of its business as of December 31, 1923. They had been employed at the end of each of the three years preceding to render a like service. Fred Stern & Co., Inc., which was in substance Stern himself, was engaged in the importation and sale of rubber. To finance its operations, it required extensive credit and borrowed large sums of money from banks and other lenders. All this was known to the defendants. The defendants knew also that in the usual course of business the balance sheet when certified would be exhibited by the Stern company to banks, creditors, stockholders, purchasers or

sellers, according to the needs of the occasion, as the basis of financial dealings. Accordingly, when the balance sheet was made up, the defendants supplied the Stern company with thirty-two copies certified with serial numbers as counterpart originals. Nothing was said as to the persons to whom these counterparts would be shown or the extent or number of the transactions in which they would be used. In particular there was no mention of the plaintiff, a corporation doing business chiefly as a factor, which till then had never made advances to the Stern company, though it had sold merchandise in small amounts. The range of the transactions in which a certificate of audit might be expected to play a part was as indefinite and wide as the possibilities of the business that was mirrored in the summary.

By February 26, 1924, the audit was finished and the balance sheet made up. It stated assets in the sum of $2,550,671.88 and liabilities other than capital and surplus in the sum of $1,479,956.62, thus showing a net worth of $1,070,715.26. Attached to the balance sheet was a certificate as follows:

" Touche, Niven & Co.
" Public Accountants
" Eighty Maiden Lane
" New York

" *February* 26, 1924.

" Certificate of Auditors

" We have examined the accounts of Fred Stern & Co., Inc., for the year ending December 31, 1923, and hereby certify that the annexed balance sheet is in accordance therewith and with the information and explanations given us. We further certify that, subject to provision for federal taxes on income, the said statement, in our opinion, presents a true and correct view of the financial condition of Fred Stern & Co., Inc., as at December 31, 1923.

" TOUCHE, NIVEN & CO.
" *Public Accountants.*"

Capital and surplus were intact if the balance sheet was accurate. In reality both had been wiped out, and the corporation was insolvent. The books had been falsified by those in charge of the business so as to set forth accounts receivable and other assets which turned out to be fictitious. The plaintiff maintains that the certificate of audit was erroneous in both its branches. The first branch, the asserted correspondence between the accounts and the balance sheet, is one purporting to be made as of the knowledge of the auditors. The second branch, which certifies to a belief that the condition reflected in the balance sheet presents a true and correct picture of the resources of the business, is stated as a matter of opinion. In the view of the plaintiff, both branches of the certificate are either fraudulent or negligent. As to one class of assets, the item of accounts receivable, if not also as to others, there was no real correspondence, we are told, between balance sheet and books, or so the triers of the facts might find. If correspondence, however, be assumed, a closer examination of supporting invoices and records, or a fuller inquiry directed to the persons appearing on the books as creditors or debtors, would have exhibited the truth.

The plaintiff, a corporation engaged in business as a factor, was approached by Stern in March, 1924, with a request for loans of money to finance the sales of rubber. Up to that time the dealings between the two houses were on a cash basis and trifling in amount. As a condition of any loans the plaintiff insisted that it receive a balance sheet certified by public accountants, and in response to that demand it was given one of the certificates signed by the defendants and then in Stern's possession. On the faith of that certificate the plaintiff made a loan which was followed by many others. The course of business was for Stern to deliver to the plaintiff documents described as trust receipts which in effect were executory assignments of the moneys payable by pur-

chasers for goods thereafter to be sold. When the purchase price was due, the plaintiff received the payment, reimbursing itself therefrom for its advances and commissions. Some of these transactions were effected without loss. Nearly a year later, in December, 1924, the house of cards collapsed. In that month, plaintiff made three loans to the Stern company, one of $100,000, a second of $25,000, and a third of $40,000. For some of these loans no security was received. For some of the earlier loans the security was inadequate. On January 2, 1925, the Stern company was declared a bankrupt.

This action, brought against the accountants in November, 1926, to recover the loss suffered by the plaintiff in reliance upon the audit, was in its inception one for negligence. On the trial there was added a second cause of action asserting fraud also. The trial judge dismissed the second cause of action without submitting it to the jury. As to the first cause of action, he reserved his decision on the defendants' motion to dismiss, and took the jury's verdict. They were told that the defendants might be held liable if with knowledge that the results of the audit would be communicated to creditors they did the work negligently, and that negligence was the omission to use reasonable and ordinary care. The verdict was in favor of the plaintiff for $187,576.32. On the coming in of the verdict, the judge granted the reserved motion. The Appellate Division affirmed the dismissal of the cause of action for fraud, but reversed the dismissal of the cause of action for negligence, and reinstated the verdict. The case is here on cross-appeals.

The two causes of action will be considered in succession, first the one for negligence and second that for fraud.

(1) We think the evidence supports a finding that the audit was negligently made, though in so saying we put aside for the moment the question whether negligence, even if it existed, was a wrong to the plaintiff. To explain fully or adequately how the defendants were at

fault would carry this opinion beyond reasonable bounds. A sketch, however, there must be, at least in respect of some features of the audit, for the nature of the fault, when understood, is helpful in defining the ambit of the duty.

We begin with the item of accounts receivable. At the start of the defendant's audit, there had been no posting of, the general ledger since April, 1923. Siess, a junior accountant, was assigned by the defendants to the performance of that work. On Sunday, February 3, 1924, he had finished the task of posting, and was ready the next day to begin with his associates the preparation of the balance sheet and the audit of its items. The total of the accounts receivable for December, 1923, as thus posted by Siess from the entries in the journal, was $644,758.17. At some time on February 3, Romberg, an employee of the Stern company, who had general charge of its accounts, placed below that total another item to represent additional accounts receivable growing out of the transactions of the month. This new item, $706,843.07, Romberg entered in his own handwriting. The sales that it represented were, each and all, fictitious. Opposite the entry were placed other figures (12–29), indicating or supposed to indicate a reference to the journal. Siess when he resumed his work saw the entries thus added, and included the new item in making up his footings, with the result of an apparent increase of over $700,000 in the assets of the business. He says that in doing this he supposed the entries to be correct, and that his task at the moment being merely to post the books, he thought the work of audit or verification might come later, and put it off accordingly. The time sheets, which are in evidence, show very clearly that this was the order of time in which the parts of the work were done. Verification, however, there never was either by Siess or by his superiors, or so the triers of the facts might say. If any had been attempted, or any that was

adequate, an examiner would have found that the entry in the ledger was not supported by any entry in the journal. If from the journal he had gone to the book from which the journal was made up, described as " the debit memo book," support would still have failed. Going farther, he would have found invoices, seventeen in number, which amounted in the aggregate to the interpolated item, but scrutiny of these invoices would have disclosed suspicious features in that they had no shipping number nor a customer's order number and varied in terms of credit and in other respects from those usual in the business. A mere glance reveals the difference.

The December entry of accounts receivable was not the only item that a careful and skillful auditor would have desired to investigate. There was ground for suspicion as to an item of $113,199.60, included in the accounts payable as due from the Baltic Corporation. As to this the defendants received an explanation, not very convincing, from Stern and Romberg. A cautious auditor might have been dissatisfied and have uncovered what was wrong. There was ground for suspicion also because of the inflation of the inventory. The inventory as it was given to the auditors, was totaled at $347,219.08. The defendants discovered errors in the sum of $303,863.20, and adjusted the balance sheet accordingly. Both the extent of the discrepancy and its causes might have been found to cast discredit upon the business and the books. There was ground for suspicion again in the record of assigned accounts. Inquiry of the creditors gave notice to the defendants that the same accounts had been pledged to two, three and four banks at the same time. The pledges did not diminish the value of the assets, but made in such circumstances they might well evoke a doubt as to the solvency of a business where such conduct was permitted. There was an explanation by Romberg which the defendants accepted as sufficient. Caution and diligence might have pressed investigation farther.

If the defendants owed a duty to the plaintiff to act with the same care that would have been due under a contract of employment, a jury was at liberty to find a verdict of negligence upon a showing of a scrutiny so imperfect and perfunctory. No doubt the extent to which inquiry must be pressed beyond appearances is a question of judgment, as to which opinions will often differ. No doubt the wisdom that is born after the event will engender suspicion and distrust when old acquaintance and good repute may have silenced doubt at the beginning. All this is to be weighed by a jury in applying its standard of behavior, the state of mind and conduct of the reasonable man. Even so, the adverse verdict, when rendered, imports an alignment of the weights in their proper places in the balance and a reckoning thereafter. The reckoning was not wrong upon the evidence before us, if duty be assumed.

We are brought to the question of duty, its origin and measure.

The defendants owed to their employer a duty imposed by law to make their certificate without fraud, and a duty growing out of contract to make it with the care and caution proper to their calling. Fraud includes the pretense of knowledge when knowledge there is none. To creditors and investors to whom the employer exhibited the certificate, the defendants owed a like duty to make it without fraud, since there was notice in the circumstances of its making that the employer did not intend to keep it to himself (*Eaton, Cole & Burnham Co.* v. *Avery*, 83 N. Y. 31; *Tindle* v. *Birkett*, 171 N. Y. 520). A different question develops when we ask whether they owed a duty to these to make it without negligence. If liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business con-

ducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences. We put aside for the moment any statement in the certificate which involves the representation of a fact as true to the knowledge of the auditors. If such a statement was made, whether believed to be true or not, the defendants are liable for deceit in the event that it was false. The plaintiff does not need the invention of novel doctrine to help it out in such conditions. The case was submitted to the jury and the verdict was returned upon the theory that even in the absence of a misstatement of a fact there is a liability also for erroneous opinion. The expression of an opinion is to be subject to a warranty implied by law. What, then, is the warranty, as yet unformulated, to be? Is it merely that the opinion is honestly conceived and that the preliminary inquiry has been honestly pursued, that a halt has not been made without a genuine belief that the search has been reasonably adequate to bring disclosure of the truth? Or does it go farther and involve the assumption of a liability for any blunder or inattention that could fairly be spoken of as negligence if the controversy were one between accountant and employer for breach of a contract to render services for pay?

The assault upon the citadel of privity is proceeding in these days apace. How far the inroads shall extend is now a favorite subject of juridical discussion (Williston, Liability for Honest Misrepresentation, 24 Harv. L. Rev. 415, 433; Bohlen, Studies in the Law of Torts, pp. 150, 151; Bohlen, Misrepresentation as Deceit, Negligence or Warranty, 42 Harv. L. Rev. 733; Smith, Liability for Negligent Language, 14 Harv. L. Rev. 184; Green, Judge and Jury, chapter Deceit, p. 280; 16 Va. Law Rev. 749). In the field of the law of contract there has been a gradual widening of the doctrine of *Lawrence* v. *Fox* (20 N. Y. 268), until today the beneficiary of a promise, clearly

designated as such, is seldom left without a remedy (*Seaver* v. *Ransom*, 224 N. Y. 233, 238). Even in that field, however, the remedy is narrower where the beneficiaries of the promise are indeterminate or general. Something more must then appear than an intention that the promise shall redound to the benefit of the public or to that of a class of indefinite extension. The promise must be such as to " bespeak the assumption of a duty to make reparation directly to the individual members of the public if the benefit is lost " (*Moch Co.* v. *Rensselaer Water Co.*, 247 N. Y. 160, 164; American Law Institute, Restatement of the Law of Contracts, § 145). In the field of the law of torts a manufacturer who is negligent in the manufacture of a chattel in circumstances pointing to an unreasonable risk of serious bodily harm to those using it thereafter may be liable for negligence though privity is lacking between manufacturer and user (*MacPherson* v. *Buick Motor Co.*, 217 N. Y. 382; American Law Institute, Restatement of the Law of Torts, § 262). A force or instrument of harm having been launched with potentialities of danger manifest to the eye of prudence, the one who launches it is under a duty to keep it within bounds (*Moch Co.* v. *Rensselaer Water Co.*, *supra*, at p. 168). Even so, the question is still open whether the potentialities of danger that will charge with liability are confined to harm to the person, or include injury to property (*Pine Grove Poultry Farm* v. *Newton B.-P. Mfg. Co.*, 248 N. Y. 293, 296; *Robins Dry Dock & Repair Co.* v. *Flint*, 275 U. S. 303; American Law Institute, Restatement of the Law of Torts, *supra*). In either view, however, what is released or set in motion is a physical force. We are now asked to say that a like liability attaches to the circulation of a thought or a release of the explosive power resident in words.

Three cases in this court are said by the plaintiff to have committed us to the doctrine that words, written or oral, if negligently published with the expectation that

the reader or listener will transmit them to another, will lay a basis for liability though privity be lacking. These are *Glanzer* v. *Shepard* (233 N. Y. 236); *International Products Co.* v. *Erie R. R. Co.* (244 N. Y. 331), and *Doyle* v. *Chatham & Phenix Nat. Bank* (253 N. Y. 369).

In *Glanzer* v. *Shepard* the seller of beans requested the defendants, public weighers, to make return of the weight and furnish the buyer with a copy. This the defendants did. Their return, which was made out in duplicate, one copy to the seller and the other to the buyer, recites that it was made by order of the former for the use of the latter. The buyer paid the seller on the faith of the certificate which turned out to be erroneous. We held that the weighers were liable at the suit of the buyer for the moneys overpaid. Here was something more than the rendition of a service in the expectation that the one who ordered the certificate would use it thereafter in the operations of his business as occasion might require. Here was a case where the transmission of the certificate to another was not merely one possibility among many, but the " end and aim of the transaction," as certain and immediate and deliberately willed as if a husband were to order a gown to be delivered to his wife, or a telegraph company, contracting with the sender of a message, were to telegraph it wrongly to the damage of the person expected to receive it (*Wolfskehl* v. *Western Union Tel. Co.*, 46 Hun, 542; *DeRuth* v. *New York, etc., Tel. Co.*, 1 Daly, 547; *Milliken* v. *Western Union Tel. Co.*, 110 N. Y. 403, 410). The intimacy of the resulting nexus is attested by the fact that after stating the case in terms of legal duty, we went on to point out that viewing it as a phase or extension of *Lawrence* v. *Fox* (*supra*), or *Seaver* v. *Ransom* (*supra*), we could reach the same result by stating it in terms of contract (cf. *Economy Building & Loan Assn.* v. *West Jersey Title Co.*, 64 N. J. L. 27; *Young* v. *Lohr*, 118 Iowa, 624; *Murphy* v. *Fidelity, Abstract & Title Co.*, 114 Wash. 77). The bond was so close as to

approach that of privity, if not completely one with it. Not so in the case at hand. No one would be likely to urge that there was a contractual relation, or even one approaching it, at the root of any duty that was owing from the defendants now before us to the indeterminate class of persons who, presently or in the future, might deal with the Stern company in reliance on the audit. In a word, the service rendered by the defendant in *Glanzer* v. *Shepard* was primarily for the information of a third person, in effect, if not in name, a party to the contract, and only incidentally for that of the formal promisee. In the case at hand, the service was primarily for the benefit of the Stern company, a convenient instrumentality for use in the development of the business, and only incidentally or collaterally for the use of those to whom Stern and his associates might exhibit it thereafter. Foresight of these possibilities may charge with liability for fraud. The conclusion does not follow that it will charge with liability for negligence.

In the next of the three cases (*International Products Co.* v. *Erie R. R. Co., supra*) the plaintiff, an importer, had an agreement with the defendant, a railroad company, that the latter would act as bailee of goods arriving from abroad. The importer, to protect the goods by suitable insurance, made inquiry of the bailee as to the location of the storage. The warehouse was incorrectly named, and the policy did not attach. Here was a determinate relation, that of bailor and bailee, either present or prospective, with peculiar opportunity for knowledge on the part of the bailee as to the subject-matter of the statement and with a continuing duty to correct it if erroneous. Even the narrowest holdings as to liability for unintentional misstatement concede that a representation in such circumstances may be equivalent to a warranty. There is a class of cases " where a person within whose special province it lay to know a particular fact, has given an erroneous answer to an inquiry made with regard

to it by a person desirous of ascertaining the fact for the purpose of determining his course accordingly, and has been held bound to make good the assurance he has given " (HERSCHELL, L. C., in *Derry* v. *Peek*, [L. R.] 14 A. C. 337, 360). So in *Burrowes* v. *Lock* (10 Ves. 470), a trustee was asked by one who expected to make a loan upon the security of a trust fund whether notice of any prior incumbrance upon the fund had been given to him. An action for damages was upheld though the false answer was made honestly in the belief that it was true (cf. *Brownlie* v. *Campbell*, [L. R.] 5 A. C. 925, 935; *Doyle* v. *Chatham & Phenix Nat. Bank, supra*, at p. 379).

In one respect the decision in *International Products Co.* v. *Erie R. R. Co.* is in advance of anything decided in *Glanzer* v. *Shepard*. The latter case suggests that the liability there enforced was not one for the mere utterance of words without due consideration, but for a negligent service, the act of weighing, which happened to find in the words of the certificate its culmination and its summary. This was said in the endeavor to emphasize the character of the certificate as a business transaction, an act in the law, and not a mere casual response to a request for information. The ruling in the case of the *Erie Railroad* shows that the rendition of a service is at most a mere circumstance and not an indispensable condition. The Erie was not held for negligence in the rendition of a service. It was held for words and nothing more. So in the case at hand. If liability for the consequences of a negligent certificate may be enforced by any member of an indeterminate class of creditors, present and prospective, known and unknown, the existence or non-existence of a preliminary act of service will not affect the cause of action. The service may have been rendered as carefully as you please, and its quality will count for nothing if there was negligence thereafter in distributing the summary.

*Doyle* v. *Chatham & Phenix Nat. Bank (supra)*, the

third of the cases cited, is even more plainly indecisive. A trust company was a trustee under a deed of trust to secure an issue of bonds. It was held liable to a subscriber for the bonds when it certified them falsely. A representation by a trustee intended to sway action had been addressed to a person who by the act of subscription was to become a party to the deed and a *cestui que trust*.

The antidote to these decisions and to the over-use of the doctrine of liability for negligent misstatement may be found in *Jaillet* v. *Cashman* (235 N. Y. 511) and *Courteen Seed Co.* v. *Hong Kong & Shanghai Banking P. Corp.* (245 N. Y. 377). In the first of these cases the defendant supplying ticker service to brokers was held not liable in damages to one of the broker's customers for the consequences of reliance upon a report negligently published on the ticker. If liability had been upheld, the step would have been a short one to the declaration of a like liability on the part of proprietors of newspapers. In the second the principle was clearly stated by POUND, J., that " negligent words are not actionable unless they are uttered directly, with knowledge or notice that they will be acted on, to one to whom the speaker is bound by some relation of duty, arising out of public calling, contract or otherwise, to act with care if he acts at all."

From the foregoing analysis the conclusion is, we think, inevitable that nothing in our previous decisions commits us to a holding of liability for negligence in the circumstances of the case at hand, and that such liability, if recognized, will be an extension of the principle of those decisions to different conditions, even if more or less analogous. The question then is whether such an extension shall be made.

The extension, if made, will so expand the field of liability for negligent speech as to make it nearly, if not quite, coterminous with that of liability for fraud. Again and again, in decisions of this court, the bounds of this

latter liability have been set up, with futility the fate of every endeavor to dislodge them. Scienter has been declared to be an indispensable element except where the representation has been put forward as true of one's own knowledge (*Hadcock* v. *Osmer*, 153 N. Y. 604), or in circumstances where the expression of opinion was a dishonorable pretense (3 Williston, Contracts, § 1494; *Smith* v. *Land & House Prop. Corp.*, [L. R.] 28 Ch. Div. 7, 15; *Sleeper* v. *Smith*, 77 N. H. 337; *Andrews* v. *Jackson*, 168 Mass. 266; *People ex rel. Gellis* v. *Sheriff*, 251 N. Y. 33, 37; *Hickey* v. *Morrell*, 102 N. Y. 454, 463; *Merry Realty Co.* v. *Martin*, 103 Misc. Rep. 9, 14; 186 App. Div. 538). Even an opinion, especially an opinion by an expert, may be found to be fraudulent if the grounds supporting it are so flimsy as to lead to the conclusion that there was no genuine belief back of it. Further than that this court has never gone. Directors of corporations have been acquitted of liability for deceit though they have been lax in investigation and negligent in speech (*Reno* v. *Bull*, 226 N. Y. 546, and cases there cited; *Kountze* v. *Kennedy*, 147 N. Y. 124). This has not meant, to be sure, that negligence may not be evidence from which a trier of the facts may draw an inference of fraud (*Derry* v. *Peek*, [L. R.] 14 A. C. 337, 369, 375, 376), but merely that if that inference is rejected, or, in the light of all the circumstances, is found to be unreasonable, negligence alone is not a substitute for fraud. Many also are the cases that have distinguished between the willful or reckless representation essential to the maintenance at law of an action for deceit, and the misrepresentation, negligent or innocent, that will lay a sufficient basis for rescission in equity (*Bloomquist* v. *Farson*, 222 N. Y. 375; *Seneca Wire & Mfg. Co.* v. *Leach & Co.*, 247 N. Y. 1). If this action is well conceived, all these principles and distinctions, so nicely wrought and formulated, have been a waste of time and effort. They have even been a snare, entrapping litigants and lawyers into an abandonment of the true remedy lying ready to the call. The suitors

thrown out of court because they proved negligence, and nothing else, in an action for deceit, might have ridden to triumphant victory if they had proved the self-same facts, but had given the wrong another label, and all this in a State where forms of action have been abolished. So to hold is near to saying that we have been paltering with justice. A word of caution or suggestion would have set the erring suitor right. Many pages of opinion were written by judges the most eminent, yet the word was never spoken. We may not speak it now. A change so revolutionary, if expedient, must be wrought by legislation (*Landell* v. *Lybrand*, 264 Penn. St. 406).

We have said that the duty to refrain from negligent representation would become coincident or nearly so with the duty to refrain from fraud if this action could be maintained. A representation even though knowingly false does not constitute ground for an action of deceit unless made with the intent to be communicated to the persons or class of persons who act upon it to their prejudice (*Eaton, Cole & Burnham Co.* v. *Avery, supra*). Affirmance of this judgment would require us to hold that all or nearly all the persons so situated would suffer an impairment of an interest legally protected if the representation had been negligent. We speak of all " or nearly all," for cases can be imagined where a casual response, made in circumstances insufficient to indicate that care should be expected, would permit recovery for fraud if willfully deceitful. Cases of fraud between persons so circumstanced are, however, too infrequent and exceptional to make the radii greatly different if the fields of liability for negligence and deceit be figured as concentric circles. The like may be said of the possibility that the negligence of the injured party, contributing to the result, may avail to overcome the one remedy, though unavailing to defeat the other.

Neither of these possibilities is noted by the plaintiff in its answer to the suggestion that the two fields would

be coincident. Its answer has been merely this, *first*, that the duty to speak with care does not arise unless the words are the culmination of a service, and *second*, that it does not arise unless the service is rendered in the pursuit of an independent calling, characterized as public. As to the first of these suggestions, we have already had occasion to observe that given a relation making diligence a duty, speech as well as conduct must conform to that exacting standard (*International Products Co.* v. *Erie R. R. Co., supra*). As to the second of the two suggestions, public accountants are public only in the sense that their services are offered to any one who chooses to employ them. This is far from saying that those who do not employ them are in the same position as those who do.

Liability for negligence if adjudged in this case will extend to many callings other than an auditor's. Lawyers who certify their opinion as to the validity of municipal or corporate bonds with knowledge that the opinion will be brought to the notice of the public, will become liable to the investors, if they have overlooked a statute or a decision, to the same extent as if the controversy were one between client and adviser. Title companies insuring titles to a tract of land, with knowledge that at an approaching auction the fact that they have insured will be stated to the bidders, will become liable to purchasers who may wish the benefit of a policy without payment of a premium. These illustrations may seem to be extreme, but they go little, if any, farther than we are invited to go now. Negligence, moreover, will have one standard when viewed in relation to the employer, and another and at times a stricter standard when viewed in relation to the public. Explanations that might seem plausible, omissions that might be reasonable, if the duty is confined to the employer, conducting a business that presumably at least is not a fraud upon his creditors, might wear another aspect if an independent duty to be suspicious

even of one's principal is owing to investors. "Every one making a promise having the quality of a contract will be under a duty to the promisee by virtue of the promise, but under another duty, apart from contract, to an indefinite number of potential beneficiaries when performance has begun. The assumption of one relation will mean the involuntary assumption of a series of new relations, inescapably hooked together" (*Moch Co.* v. *Rensselaer Water Co., supra,* at p. 168). "The law does not spread its protection so far" (*Robins Dry Dock & Repair Co.* v. *Flint, supra,* at p. 309).

Our holding does not emancipate accountants from the consequences of fraud. It does not relieve them if their audit has been so negligent as to justify a finding that they had no genuine belief in its adequacy, for this again is fraud. It does no more than say that if less than this is proved, if there has been neither reckless misstatement nor insincere profession of an opinion, but only honest blunder, the ensuing liability for negligence is one that is bounded by the contract, and is to be enforced between the parties by whom the contract has been made. We doubt whether the average business man receiving a certificate without paying for it and receiving it merely as one among a multitude of possible investors, would look for anything more.

(2) The second cause of action is yet to be considered.

The defendants certified as a fact, true to their own knowledge, that the balance sheet was in accordance with the books of account. If their statement was false, they are not to be exonerated because they believed it to be true (*Hadcock* v. *Osmer, supra; Lehigh Zinc & Iron Co.* v. *Bamford,* 150 U. S. 665, 673; *Chatham Furnace Co.* v. *Moffatt,* 147 Mass. 403; *Arnold* v. *Richardson,* 74 App. Div. 581). We think the triers of the facts might hold it to be false.

Correspondence between the balance sheet and the books imports something more, or so the triers of the

facts might say, than correspondence between the balance sheet and the general ledger, unsupported or even contradicted by every other record. The correspondence to be of any moment may not unreasonably be held to signify a correspondence between the statement and the books of original entry, the books taken as a whole. If that is what the certificate means, a jury could find that the correspondence did not exist and that the defendants signed the certificates without knowing it to exist and even without reasonable grounds for belief in its existence. The item of $706,000, representing fictitious accounts receivable, was entered in the ledger after defendant's employee Siess had posted the December sales. He knew of the interpolation, and knew that there was need to verify the entry by reference to books other than the ledger before the books could be found to be in agreement with the balance sheet. The evidence would sustain a finding that this was never done. By concession the interpolated item had no support in the journal, or in any journal voucher, or in the debit memo book, which was a summary of the invoices, or in any thing except the invoices themselves. The defendants do not say that they ever looked at the invoices, seventeen in number, representing these accounts. They profess to be unable to recall whether they did so or not. They admit, however, that if they had looked, they would have found omissions and irregularities so many and unusual as to have called for further investigation. When we couple the refusal to say that they did look with the admission that if they had looked, they would or could have seen, the situation is revealed as one in which a jury might reasonably find that in truth they did not look, but certified the correspondence without testing its existence.

In this connection we are to bear in mind the principle already stated in the course of this opinion that negligence or blindness, even when not equivalent to fraud,

is none the less evidence to sustain an inference of fraud. At least this is so if the negligence is gross. Not a little confusion has at times resulted from an undiscriminating quotation of statements in *Kountze* v. *Kennedy* (*supra*), statements proper enough in their setting, but capable of misleading when extracted and considered by themselves. " Misjudgment, however gross," it was there observed, " or want of caution, however marked, is not fraud." This was said in a case where the trier of the facts had held the defendants guiltless. The judgment in this court amounted merely to a holding that a finding of fraud did not follow as an inference of law. There was no holding that the evidence would have required a reversal of the judgment if the finding as to guilt had been the other way. Even *Derry* v. *Peek*, as we have seen, asserts the probative effect of negligence as an evidentiary fact. We had no thought in *Kountze* v. *Kennedy* of upholding a doctrine more favorable to wrongdoers, though there was a reservation suggesting the approval of a rule more rigorous. The opinion of this court cites *Derry* v. *Peek*, and states the holding there made that an action would not lie if the defendant believed the representation made by him to be true, although without reasonable cause for such belief. " It is not necessary," we said, " to go to this extent to uphold the present judgment, for the referee, as has been stated, found that the belief of Kennedy * * * was based upon reasonable grounds." The setting of the occasion justified the inference that the representations did not involve a profession of knowledge as distinguished from belief (147 N. Y. at p. 133). No such charity of construction exonerates accountants, who by the very nature of their calling profess to speak with knowledge when certifying to an agreement between the audit and the entries.

The defendants attempt to excuse the omission of an inspection of the invoices proved to be fictitious by invoking a practice known as that of testing and sampling. A

random choice of accounts is made from the total number on the books, and these, if found to be regular when inspected and investigated, are taken as a fair indication of the quality of the mass. The defendants say that about 200 invoices were examined in accordance with this practice, but they do not assert that any of the seventeen invoices supporting the fictitious sales were among the number so selected. Verification by test and sample was very likely a sufficient audit as to accounts regularly entered upon the books in the usual course of business. It was plainly insufficient, however, as to accounts not entered upon the books where inspection of the invoices was necessary, not as a check upon accounts fair upon their face, but in order to ascertain whether there were any accounts at all. If the only invoices inspected were invoices unrelated to the interpolated entry, the result was to certify a correspondence between the books and the balance sheet without any effort by the auditors, as to $706,000 of accounts, to ascertain whether the certified agreement was in accordance with the truth. How far books of account fair upon their face are to be probed by accountants in an effort to ascertain whether the transactions back of them are in accordance with the entries, involves to some extent the exercise of judgment and discretion. Not so, however, the inquiry whether the entries certified as there, are there in very truth, there in the form and in the places where men of business training would expect them to be. The defendants were put on their guard by the circumstances touching the December accounts receivable to scrutinize with special care. A jury might find that with suspicions thus awakened, they closed their eyes to the obvious, and blindly gave assent.

We conclude, to sum up the situation, that in certifying to the correspondence between balance sheet and accounts the defendants made a statement as true to their own knowledge, when they had, as a jury might find, no

knowledge on the subject. If that is so, they may also be found to have acted without information leading to a sincere or genuine belief when they certified to an opinion that the balance sheet faithfully reflected the condition of the business.

Whatever wrong was committed by the defendants was not their personal act or omission, but that of their subordinates. This does not relieve them, however, of liability to answer in damages for the consequences of the wrong, if wrong there shall be found to be. It is not a question of constructive notice, as where facts are brought home to the knowledge of subordinates whose interests are adverse to those of the employer (*Henry* v. *Allen*, 151 N. Y. 1; see, however, American Law Institute, Restatement of the Law of Agency, § 506, subd. 2-a). These subordinates, so far as the record shows, had no interests adverse to the defendants', nor any thought in what they did to be unfaithful to their trust. The question is merely this, whether the defendants, having delegated the performance of this work to agents of their own selection, are responsible for the manner in which the business of the agency was done. As to that the answer is not doubtful (*Fifth Ave. Bank* v. *42d St., etc., R. R. Co.*, 137 N. Y. 231; *Gleason* v. *Seaboard Air Line Ry. Co.*, 278 U. S. 349, 356; American Law Institute, Restatement of the Law of Agency, § 481).

Upon the defendants' appeal as to the first cause of action, the judgment of the Appellate Division should be reversed, and that of the Trial Term affirmed, with costs in the Appellate Division and in this court.

Upon the plaintiff's appeal as to the second cause of action, the judgment of the Appellate Division and that of the Trial Term should be reversed, and a new trial granted, with costs to abide the event.

POUND, CRANE, LEHMAN, KELLOGG, O'BRIEN and HUBBS, JJ., concur.

Judgment accordingly.