# UNITED STATES PIPE & FOUNDRY COMPANY ET AL. V. CITY OF WACO ET AL.*

No. 7239.  Decided June 2, 1937.
Rehearing overruled July 28, 1937.
(108 S. W., 2d Series, 433.)

---

*Writ of certiorari denied, 302 U. S. 749, 58 Sup. Ct. 266, 82 L. Ed. 119.

*Naman & Howell, Bryan & Maxwell, John Maxwell, C. B. Emery, Witt, Terrell & Witt,* all of Waco, *Bromberg, Leftwich, Carrington & Gowan, Paul Carrington, Worsham, Burford, Ryburn & Hincks,* and *I. J. Walker,* all of Dallas, and *A. S. Rollins,* of Greenville, for plaintiffs in error.

It was error for the Court of Civil Appeals to hold that damages were recoverable against the United States Pipe & Foundry Company for the entire cost of the pipe line for the reason that such value involved the diminution of the value due not only to the inadequacy of the pipe but also to the defects in performance of the contractor in laying the pipe. Also because from the evidence the representations as to the quality and durability of the pipe was an expression of an opinion or judgment and did not constitute a warranty. Danciger v. Smith, 229 S. W. 909; McFadden v. Missouri, K. & T. Ry. Co., 92 S. W. 989; City of Sherman v. Connor & Oliver, 88 Texas 35, 29 S. W. 1053; Avery Co. v. Barker, 243 S. W. 695; Jackson v. E. L. Rice & Co., 295 S. W. 352.

*Sam Darden,* City Attorney, *John McGlasson, A. V. McDonnell,* and *McClellan, Lincoln & Jones,* all of Waco, for defendant in error.

The acts of the pipe line company resulting in a breach of the contract by the engineers in furnishing proper specifications and the contractors for the construction of the pipe line were willful and intentional. Therefore the measure of damages is for a willful and intentional breach of a building contract, that is the cost of reconstruction according to the original contract regardless of how expensive it may be. Atkinson v. Jackson Bros., (Com. App.) 270 S. W. 848; Cassanelli v. Stacy, (Ky.) 38 S. W. (2d) 980; Page on Contracts, Sec. 3216.

The representations made by the pipe company concerning the strength specified in the pipe to be used in the water line were positive affirmations of fact as distinguished from mere opinion, and since such representations were of a character from which the law deduces a warranty and which were acted upon as such, they will be held to constitute a warranty that the pipe was adequate in strength for successful use. Blythe v. Speake, 23 Texas 429; Harroll v. McDuffie, 128 S. W. 1149; Roberts v. Roberts, 27 S. W. (2d) 880; Fulwiler v. Lawrence, 7 S. W. (2d) 636.

MR. JUDGE MARTIN, of the Commission of Appeals, delivered the opinion for the Court.

An exhaustive statement of the facts out of which the present controversy grew has been made by the Court of Civil Appeals in its original opinion and on motion for rehearing. See 100 S. W. (2d) 1099. (Opinion on motion for rehearing not published.) Only controlling facts will be here mentioned, and these, where possible, will be abbreviated to mere conclusions.

The City of Waco had installed by contract an underground pipe line for the conveyance of water from its storage lake to the city, a distance of some five miles, at a cost to it of approximately $387,000. Within a comparatively short time about seventy breaks appeared in this line, and it is described by witnesses as practically worthless except as a temporary line. The actors in the transactions which culminated in a judgment in favor of the City against the manufacturer of the pipe used in said line were: the United States Pipe and Foundry Company, hereafter referred to as the manufacturer, W. E. Callahan Construction Company, hereafter referred to as the contractor, Floyd & Lochridge, referred to as engineers, and the City of Waco, referred to hereafter as the City.

The City desired to build the said line, but had limited funds, a fact well known to the contractor and communicated to the manufacturer. The last two agreed to make an effort to have the City specify Hi-tensile pipe to be used in the construction of said line. It appears that cast iron pipe and concrete were competitive material, and that the latter material was the one favored most, owing to its low original cost. To meet such competition it was necessary to have some cheaper material than cast iron pipe. Hi-tensile pipe was claimed by the said manufacturer to be such. It was of comparatively recent origin and little known to users of pipe line material. It was made lighter, and consequently cheaper, than cast iron, but many claims of merit were made for it, as will hereafter briefly appear. The manufacturer agreed to sell such material to the said contractor as cheaply as it sold it to anyone. It actually thereafter quoted and sold it for a price to the said contractor under that quoted to anyone else. A "drive" was successfully made to secure its specification by the City in its plan for the construction of said line.

The contract was let to the aforesaid contractor, and Hi-tensile pipe purchased from the manufacturer and used with the result mentioned.

The City sued the three above parties, alleging a conspiracy and in the alternative for damages severally against each. One theory of the City in short was that the situation was so manipulated as to insure the sale of Hi-tensile pipe by the manufacturer,

and the award of the construction job to the contractor, and we think the facts and circumstances tend to support this theory. Many of these appear in the opinion of the Court of Civil Appeals, and will not be repeated.

The pipe used appeared strong enough to resist the internal, but not the external pressure. Otherwise expressed, the numerous breaks occurring in same were shown to be caused by external pressure, presumably of the earth which covered same in varying depths along the route of the line.

We quote from the Court of Civil Appeals opinion:

"The jury on ample evidence found that the pipe specified in the specifications for use in the Waco line was inadequate in strength for the services intended and that the pipe actually installed in the line was inadequate in strength for the depth of cover under which it was laid."

There were many statements shown to have been made by the manufacturer to the City prior to the letting of the contract in question which tended to support the City's theory of an express warranty by the manufacturer of the fitness of the pipe for the use intended, and of its quality. These are in part hereafter set out. This case was affirmed in an opinion holding that sufficient evidence appeared to support, (1) an express warranty; (2) an implied warranty, and (3) fraud.

■ We discuss only the first of these and assume for the present that the manufacturer made statements of the nature indicated above.

Conceding this, it is claimed that since warranty exists only as an incident of contract and there being in this case no contract between the City of Waco and the manufacturer, (plaintiff in error here), there could be no liability.

It is true that the manufacturer was not a formal party to the contract between the City and the contractor, nor was the City such in any agreement between the contractor and manufacturer. The City bought no pipe from the manufacturer. These were sold to the contractor, which in turn used them as per the plans and specifications of the City in constructing its line. In support of its contention, plaintiff in error invokes the familiar rule that there being no privity of contract, there is no liability to the consumer by the manufacturer where the manufacturer sells to a dealer who in turn by independent contract sells to the consumer. Looking only to the final form of the transaction under discussion the rule is applicable. Obviously a court may look through the form to the substance of such a

situation, and proceed to judgment, not upon what it seems to be, but upon what in truth it is. Here the manufacturer, in order to secure to itself the benefits of a large sale of its pipe, induced the City by representations as to its fitness and quality, to specify same. By indirection it thus secured for itself a sale as certainly, and presumably as profitably, as if a direct contract of sale had been made with the City. Having secured the benefits, it may not now avoid the burdens of the transaction. It did not need to speak, but having done so and secured a sale of its product, the law required it to speak the truth. In form, there was one voice and another's hand that signed; in truth "the voice was the voice of Jacob, but the hand was that of Esau."

The present case is unusual in its facts, but many precedents directly or by analogy support our conclusion respecting the point under consideration.

In Geo. O. Richardson Machinery Co. v. Brown, 95 Kan. 685, 149 Pac. 434, the machinery company sold a threshing machine to a dealer. To make the sale, the machinery company warranted to a farmer the fitness and quality of the machine. The farmer contracted with the dealer to do his threshing, giving his note to the dealer, who in turn indorsed same to the machinery company to secure the original purchase price, as per the original contract. The farmer sued the machinery company for damages. The Supreme Court of Kansas held: "Unusual as the circumstances are, no reason is apparent why a warranty so given and relied upon may not be the basis for whatever damages result from its breach." A like ruling under similar facts was made in the case of Timberland Lumber Co. v. Climax Mfg. Co., 61 Fed. (2d) 391.

In Ultramares Corp. v. Touche, 255 N. Y. 170, 174 N. E. 441, 74 A. L. R. 1139, the court held public accountants liable to a third party for making a false certificate relied on by such party, under the circumstances of that case, though no immediate privity of contract existed.

In that case Justice CARDOZO uses the following language:

"In Glanzer v. Shepard (233 N. Y. 236, 135 N. E. 275), the seller of beans requested the defendants, public weighers, to make return of the weight and furnish the buyer with a copy. This the defendants did. Their return, which was made out in duplicate, one copy to the seller and the other to the buyer, recites that it was made by order of the former for the use of the latter. The buyer paid the seller on the faith of the certificate which turned out to be erroneous. We held that the weighers were liable at the suit of the buyer for the moneys overpaid. Here was something more than the rendition of a service in the

expectation that the one who ordered the certificate would use it thereafter in the operations of his business as occasion might require. Here was a case where the transmission of the certificate to another was not merely one possibility among many, but the 'end and aim of the transaction,' as certain and immediate and deliberately willed as if a husband were to order a gown to be delivered to his wife, or a telegraph company, contracting with the sender of a message, were to telegraph it wrongly to the damage of the person expected to receive it. Wolfskehl v. Western Union Tel. Co., 46 Hun. 542; DeRutte v. New York, Albany & Buffalo Electric Magnetic Telegraph Co., 1 Daly 547; Milliken v. Western Union Tel. Co., 110 N. Y. 403, 410, 18 N. E. 251, 1 L. R. A. 281. The intimacy of the resulting nexus is attested by the fact that, after stating the case in terms of legal duty, we went on to point out that viewing it as a phase or extension of Lawrence v. Fox, supra (20 N. Y. 268), or Seaver v. Ransom, supra (224 N. Y. 233), we could reach the same result by stating it in terms of contract. Cf. Economy Building & Loan Assn. v. West Jersey Title Co., 64 N. J. Law 27, 44 A. 854; Young v. Lohr, 118 Iowa 624, 92 N. W. 684; Murphy v. Fidelity Abstract & Title Co., 114 Wash. 77, 194 P. 591. The bond was so close as to approach that of privity, if not completely one with it."

Many authorities are therein cited and discussed in support of the court's view.

In Madouros v. Kansas City Coca-Cola Bottling Co., (Mo. App.) 90 S. W. (2d) 445, it is held:

"Buyer of food products in sealed package can hold manufacturer under theory of implied warranty of fitness for use, even though there is no express privity of contract between manufacturer and buyer." (Syllabi quotation.)

See also Coca-Cola Bottling Company of Fort Worth v. Smith, 97 S. W. (2d) 761.

By citing the above cases this Court does not commit itself either to the correctness of the holding in each case or to the correctness of every expression therein. Their reasoning aptly applies here, and illustrates the tendency of modern courts away from the narrow legalistic view of the necessity of formal immediate privity of contract in order to sue for breach of an express or implied warranty.

It seems plain to us that the manufacturer in this case voluntarily made itself a party to the transaction in question and upon a sufficient consideration gave to the city a warranty, for the breach of which it is liable.

■ It is vigorously denied that any warranty was given for the reason that the statements relied on to show warranty were at most but the expressions of an opinion or judgment only.

To properly appraise this contention, it is necessary to here briefly sketch the background of such statements. Hi-tensile pipe was a recent invention and had been little used. The parties were not dealing with each other at arm's length, and with reference to an article as well known to one as the other. The manufacturer had a decidedly superior advantage in its knowledge of the fitness of this pipe for the use intended, and of its quality. Presumably, as its largest manufacturer, and its enthusiastic sponsor, it knew or should have known, better than the City of Waco could know, of its fitness and quality. Moreover, the inference is we think a compellable one, that it knew prior to the date of any of its statements that the City's line was at least to be an underground water line. We therefore do not consume space in deciding the vigorous dispute between the parties to this judgment, as to whether such knowledge extended to all the physical details of the line as revealed by the City's plans and specifications. The City had to build apparently within a certain money limit. The manufacturer desired to eliminate concrete from the competitive bids, and could do so most effectively by persuading the City to specify Hi-tensile pipe. To do this it forwarded a written statement to be delivered to the City, reading in part as follows:

"COMPARATIVE STRENGTH OF HI-TENSILE AND REGULAR SAND CAST PIPE UNDER CRUSHING LOADS."

"OBJECTS OF TEST
"First: To determine the suitability of cast iron pipe of comparatively thin sections for use under deep fills.

"Second: To determine whether the Modulus of Rupture calculated from the test bars is indicative of the strength of the pipe under this load.

"Third: To determine the comparative strength of Hi-tensile and regular sand cast pipe under these conditions."

* * *

"CONCLUSIONS
"First: It is evident that cast iron pipe of standard dimensions has ample strength for use under heavy fills."

* * *

"Third: That Hi-tensile pipe cast in accordance with our Specifications is amply strong for use under deep fills and meets the requirements of Specifications for culvert service."

After this the City still wavered, it appearing that there

remained some question in the mind of the engineers for the City, as to the ability of Hi-tensile pipe to withstand external pressure. Many statements are shown to have been made by the representative of the manufacturer to the City. We quote some of these:

"His (Mr. Hanlon) recommendations always were that there was no question about the pipe—that it would do the job. * * * There couldn't have been any particular strain from the inside and this pipe being thinner than the old cast iron pipe, we were very anxious to know if there was any danger on the outside pressure that might distort the pipe and cause it to break, and we were anxious to know what their experience had been at other places and if they felt sure this pipe would stand up under the conditions to which it would be subjected, and we furnished information, as I said this morning, as to the physical data and those things. * * * I think they gave us all the assurance they could * * *. I recall no doubt at all and especially when we asked about the pressure at the big cut, Mr. Hanlon didn't answer that himself but that is where he sent his profile that it might be passed on by others. * * * The external pressure was mentioned at most every conference we had because, as I say, we were not concerned over the inside pressure to carry the water. * * * Mr. Hanlon always told us he was sure the pipe would stand the load sufficient for the condition we had there. * * * Mr. Hanlon always told us he was sure the pipe would stand a load sufficient for the condition we had there.

"Q. In those conversations, were you discussing any particular class of pipe? A. Yes, sir. we were. As I recall it, nothing else but Class A head Hi-tensile pipe had been recommended when it was more or less evident that we might not be able to pay for standard cast iron pipe. * * * Yes, he said the pipe would be entirely satisfactory for this line; that he had no doubt about it. * * * There never was a product anywhere recommended to me, anything I have used in construction work, recommended with less qualifications than this pipe was for this job. We furnished that information to Mr. Hanlon and asked him, if he was not sure, to get information from higher up, and that was unqualifiedly recommended for this job from one end to the other. * * * I know we went into it in that much detail and each time he (Mr. Hanlon) always stated that there was no doubt that the pipe would stand, that the pipe had stood heavy fills at other places, and it would stand the heavy fill here."

Considered in their proper settings, and not as isolated statements, these and others of like character, amounted in effect to

an express warranty of the fitness of Hi-tensile pipe for the use intended. Except as to slight contradictions in the testimony of witnesses, the evidence is conclusive. That such statements were made for the purpose of inducing the City to specify Hi-tensile pipe is plain. The evidence is amply sufficient to support a finding that the City was in fact induced to do so by such statements.

"Any covenant, promise, or assertion of the vendor concerning the quality of the article sold, if relied upon by the vendee and understood by both parties as an absolute promise or assertion, and not a mere expression of opinion, will amount to a warranty. Any representation as to quality made by the vendor on a sale for the purpose of inducing the vendee to purchase, and which did induce him to purchase, amounts to a warranty." 37 Tex. Jur., p. 250, Sec. 103.

"Another circumstance which is treated as indicating whether a statement is a mere expression of opinion is whether or not its correctness is a matter of which either of the parties can judge as well as the other, upon which the buyer can, and may, reasonably be expected, in the exercise of ordinary diligence, to have formed his own opinion. According to some statements, the decisive test of whether there is a warranty is whether the seller assumes to assert a fact of which the buyer is ignorant, or whether he merely declares his belief with reference to a matter on which he has no special knowledge and on which the buyer may be expected also to have an opinion, and to exercise his judgment; the former situation constituting a warranty while the latter does not. Where the fact affirmed is one whose nature is such that the seller is likely to be acquainted with the truth or falsity of his statement, that circumstance indicates the affirmation to be a warranty rather than a mere opinion, although knowledge of falsity is not an essential to a warranty, while if the subject is one outside the seller's knowledge, that indicates an expression of opinion only. Although the seller's statement coincides only with his opinion or belief, nevertheless, if the manner of his expression is that of an assurance of fact on which the buyer relies, the statement is a warranty." 55 C. J., pp. 691, 692, 693.

"Superior knowledge of seller, in conjunction with the buyer's relative ignorance, operates to make the slightest divergence from mere praise into representations of fact effective as a warranty. Foote v. Wilson, 104 Kan. 191, 178 P. 430." 55 C. J., p. 692, footnote (c).

"There is another class of actions which I must refer to also for the purpose of putting it aside. I mean those cases where a

person within whose special province it lay to know a particular fact, has given an erroneous answer to an inquiry made with regard to it by a person desirous of ascertaining the fact for the purpose of determining his course accordingly, and has been held bound to make good the assurance he has given." Doyle v. Chatham & Phenix Natl. Bank, 253 N. Y. 369, 171 N. E. 574, 71 A. L. R. 1405.

Special issue No. 9 was in the following language:

"What in your opinion from a preponderance of the evidence, if any, was the reasonable value, if any, of the Waco pipe line as actually constructed as of the date of its acceptance by the City."

To this plaintiff in error filed the following objection:

"Defendant excepts and objects to Special Issue No. 9 for the reason that said issue is immaterial and irrelevant in that it can not form the basis of the determination of the damages in this case and does not present to the jury an issue on the proper measure of damage nor the damages pleaded, and in this connection this defendant shows that it could be legally liable only for the damages that proximately resulted from any wrongful conduct on its part, and excludes from the consideration of the jury factors that would increase the value to the City of the line on the date inquired about, and the value of the pipe line as inquired about in said issue involves other factors as alleged in the pleading and as shown by the evidence with which this defendant is in nowise connected, and said factors although affecting the issue of value do not in anywise affect the legal responsibility of this defendant, and for the further reason that said issue does not properly place the burden of proof upon the plaintiff to prove by the preponderance of the evidence the nature and extent of its damages and places a greater burden on the defendant than required by law in disproving plaintiff's damages."

It is our opinion that the quoted objection fails to sufficiently point out the error now complained of. It is too vague and indefinite to apprise the trial court of the defect, if any, in its submission of the measure of damages. Chase Bag Co. v. Langoria, 45 S. W. (2d) 242, and numerous cases therein collated.

We agree with the conclusion reached by the Court of Civil Appeals upon other questions raised, and deem it unnecessary to discuss same.

No reversible error being shown in the record before us, the

judgment of the trial court and Court of Civil Appeals is affirmed.

Opinion adopted by the Supreme Court June 2, 1937.

Rehearing overruled July 28, 1937.