THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* THOMAS J. MANGAN and Others, Defendants.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* THOMAS J. MANGAN and Others, Defendants.

Supreme Court, Broome County, July 13, 1931.

*John J. Bennett, Jr., Attorney-General,* for the People.

*Frank L. Wooster, District Attorney,* and *Samuel H. Pearis, Second Assistant District Attorney,* for the plaintiff.

*Clayton R. Lusk [Frank J. Mangan* of counsel], for the defendant Thomas J. Mangan.

HEATH, J. The indictments in these cases charge that the defendants as members of the examining committee of the board of directors of the State Bank of Binghamton violated section 304 of the Penal Law (added by Laws of 1912, chap. 208) by making false entries with intent to deceive the State Banking Department in four semi-annual reports of April and October, 1929, and April and October, 1930.

The reports in question were sent to the State Banking Department in compliance with sections 130 and 131 of the Banking Law of the State of New York which require that in April or May and September or October of each year the board of directors or an examining committee thereof shall make and file a sworn detailed statement of assets and liabilities.

Indictment No. 394 specifically charges that the April, 1929, report certified that a part of the valid assets of the bank consisted of bills discounted amounting to $728,314.80, when in fact $309,365 thereof were forgeries. Indictment No. 397 charges that the October, 1929, report certified bills discounted amounting to $695,320.66, when in fact $308,290 thereof were forgeries. Indictment No. 396 charges that the April, 1930, report certified bills discounted amounted to $651,489.89, when in fact $382,630.62 thereof were forgeries. Indictment No. 395 charges that the October, 1930, report certified bills discounted amounting to $715,425.68, when in fact $501,385 thereof were forgeries.

These are motions to dismiss the indictments upon the grounds that they are not founded upon evidence of violation of section 304 and also that they are founded upon illegal and improper evidence. The motions are based upon supporting affidavits and the grand jury minutes.

Motions to dismiss indictments for lack of evidence should be decided upon the grand jury minutes without the aid of supporting affidavits. It would seem that if the grand jury minutes disclose a *prima facie* case of violation of the penal statute involved, the indictments should be sustained, since a question of fact has been raised. The matters contained in supporting affidavits may be proven on the trial as a defense. In other words, a decision on a motion of this character does not go to the merits but simply

determines whether or not proper evidence was presented to the grand jury making out a *prima facie* case of violation.

If the grand jury minutes do not disclose evidence of a violation of the statute involved, the indictments must be dismissed. (*People* v. *Glen*, 173 N. Y. 395; *People* v. *Sexton*, 187 id. 495; *People* v. *Sweeney*, 213 id. 37.)

The evidence before the grand jury discloses a conspiracy upon the part of the president, Andrew J. Horvatt, and the three assistant cashiers, Michael J. Horvatt, Joseph F. Hidock and Floyd W. Mottram, as well as the bookkeeper, Joseph Polosky, to permit the president, Andrew J. Horvatt, to loot the bank and to prevent the discovery thereof by the directors and State bank examiners. According to the evidence, these five men knowingly participated in the scheme of looting by failing to include in the bank records amounts deposited by the bank's customers so that the books of the bank failed to disclose the true amount of interest and Christmas club deposits to the extent of over $1,000,000, as well as by holding out checks so that they were not entered in the books of the bank, which defalcation totaled around $300,000, as well as by forgeries of notes which were generally kept within the individual amounts of $1,000 and by making a false running of notes for the inspection of the directors' examining committee and of the State bank examiners.

The principal evidence disclosing the frauds was produced by one of the participants, Floyd W. Mottram, who testified in detail; who explained the care with which these methods of fraud were covered up so that they would not be discovered. He testified that the running of the notes exhibited to the board of directors and the examining committee was false and balanced with the books of the bank. The large defalcations were split up and accounted for by forged notes in sums of under $1,000. Because the patrons of the bank were of foreign birth and were unable to read or write English, the bodies of the majority of notes in the bank were written by the employee Hidock. It appears that many of the signatures to the notes were by cross marks witnessed by the employees who were a part of the conspiracy. The witness Mottram testified: " By a Juror: Q. But an experienced person in handling this bunch of notes and running them, would it not have been very evident that so many of these notes were different from the ordinary appearance of notes that were handled through a teller's window? A. Not so much — even that was first due to the fact that nearly all of those fictitious or boss's notes were in Joseph Hidock's handwriting. * * * We invariably made

out notes for our customers, they were inexperienced in that line, had a great deal of trouble in making out notes, although we have notes that were made out entirely by customers, but very seldom."

The grand jury minutes disclose that none of these frauds was discovered by the State bank examiners. Mottram testified that the last examination by the State bank examiners consisted of three days' work and commenced on the 14th day of May, 1930. He testified: " Q. What did the examination consist of, what did they do? A. The first thing was to take the cash — then they run the notes * * * they would take the note box over to the adding machine and make a running. Then I believe they took the note box up stairs to make a physical examination of the notes, and they made out quite a lengthy report on the condition of the bank * * *. Q. They never questioned as far as you know, the validity of any of these notes? A. Not as far as I know. Q. Now about the interest account, there is $1,000,000 lifted out of this account, how could they reconcile that with your books if there was $1,000,000 short? A. In this way — because the cards that remained in what we term the active file, the total of them checked up with the total that was carried on the general ledger. * * * Q. How could they get away with $2,500,000? A. A check up of the assets generally speaking would not show it. To go to the interest cards and run them, they would check up with the general ledger statement, or the commercial cards would check up with the general ledger because they were fixed to balance with the general ledger statement."

In relation to the examination by the examining committee of the board of directors the witness Mottram testified: " Q. Upon one of these examinations by the directors, what procedure did you observe as to the manner they went through with the notes? A. It was customary for Mr. Andrew Horvatt to call back to Mr. Thomas Mangan, to call the notes back to Mr. Mangan — meaning that Mr. Horvatt handled the actual notes, and Mr. Thomas Mangan checked them off."

The witness Mottram further testified: " Q. Was there any time that it was brought to the attention of the Board of Directors as far as you know, that conditions were not as they thought they were — I assume that these reports would show the bank's condition to be running along perfectly? A. The report that would be submitted to the directors would be simply a daily statement of the condition of the bank as it was supposed to be taken off every day from the general ledger, showing assets and liabilities of the bank, with the two columns balancing, and Mr. Horvatt, I believe, read that statement to the Board of Directors at their meetings.

* * * Q. As far as you know, were any of the directors aware of any of the irregularities of the affairs of the bank? A. One was. Q. Who was that? A. Michael J. Horvatt — Andrew J. Horvatt — none of the others to my knowledge were aware of it."

Witness Macey, a personal employee of Andrew Horvatt, testified in detail to urgings upon Andrew J. Horvatt, the president, to disclose the true facts to the directors and Vice-President Mangan, to which Horvatt replied that he could not, that if he did Mangan would kill him.

The evidence discloses that on December 13, 1930, the president of the bank, Andrew J. Horvatt, and the witness Macey went to New York city in an effort to procure a loan from the Irving Trust Company in the sum of $100,000 with which to meet the Christmas club obligations, which loan was refused. The witness Macey testified before the grand jury that he requested Horvatt to get in touch with the defendant Mangan, who was in New York city on other business, and to tell Mangan of the bank's troubles. Macey testified that Horvatt finally agreed to see Mangan but refused to agree to tell him of the actual facts. Horvatt did see Mangan and informed him that because of bond shrinkages it was necessary for the bank to secure a loan of $100,000 to meet the Christmas club obligations and Mangan immediately returned to Binghamton with Horvatt and Macey by train, arriving Sunday morning, in the meantime communicating with the State Banking Department asking that a representative be sent to Binghamton to be in touch with the situation. It appears from the evidence that a representative of the State Banking Department arrived in Binghamton Sunday and that Mangan arranged a conference with local bankers seeking a loan of $100,000 for the bank; that early Monday morning a letter written by Andrew J. Horvatt, the president, and addressed to Mangan, was found on Hidock's desk. The letter was taken to Mangan's house — opened and read. It stated that the employees Hidock, Michael Horvatt and Mottram were innocent. The evidence discloses that during the early hours Andrew Horvatt had been at the bank and that records had been burned and destroyed.

Andrew Horvatt has absconded. The bank is insolvent.

The grand jury which handed up the indictments in question has indicted Andrew J. Horvatt and the bank employees named for embezzlement, forgery, etc. The grand jury has also indicted the bank directors, including these defendants, for violation of section 297 of the Penal Law, charging a participation in the fraudulent insolvency of the bank by reason of negligence in their failure to discover and prevent the insolvency.

It is not claimed that these defendants profited through the fraud or misappropriated any of the funds.

These motions present this legal proposition for decision, namely: In order to sustain an indictment or conviction under section 304 of the Penal Law, must these defendants have had actual knowledge of the forgeries included in their statement of assets and if so, do the grand jury minutes disclose such knowledge on the part of the defendants; or conceding that the defendants did not know of the forgeries, can an indictment and a conviction thereunder be sustained on the theory that the defendants were negligent in failing to discover the forgeries?

Section 304 of the Penal Law uses the language " makes a false entry * * * with intent to deceive."

It would seem from a reading of the section that a violation thereof must be based upon deceit. Deceit presupposes knowledge or *scienter*. One cannot intend something that he knows not of .

It may well be that one may intend to deceive in a bank report by,

1. The willful inclusion of false statements as to the assets and liabilities, or the willful exclusion of items of assets and liabilities, or,

2. A willful statement that the report is based upon an examination when in fact no examination has been had.

Do the grand jury minutes disclose that these defendants as the examining committee certified to the State Banking Department that the bills discounted totaled an amount which they knew included forged paper? As to this proposition it is not claimed by the People that there is any direct evidence of knowledge. It is urged that in the semi-annual reports the defendants swore that they had made a careful examination and, therefore, it is presumed that they knew of the forgeries. This proposition is immediately met by the rule of law that a defendant is presumed to be innocent and by the evidence before the grand jury that the fraudulent conspiracy was intended to keep knowledge of the fraud from these defendants, as well as by the positive evidence that the defendants knew nothing of it.

The presumption of innocence prevails as much in the grand jury room as elsewhere and the evidence before that body must be such as to overcome that presumption before an indictment can be properly found. (*People* v. *Lindenborn*, 23 Misc. 426.)

Section 258 of the Code of Criminal Procedure provides, " the grand jury ought to find an indictment, when all the evidence before them, taken together, is such as in their judgment would,

if unexplained or uncontradicted, warrant a conviction by the trial jury."

If the sworn reports by the defendants that they had carefully examined the affairs of the bank, together with the proof of the existence of the forgeries, raises a presumption of guilt, in face of the legal presumption of innocence, it would seem that the evidence produced before the grand jury that the forgeries were undiscovered not only by these defendants, but by the State Banking Department, together with the positive evidence that the defendants did not have knowledge of the forgeries, overcomes the presumption. The evidence that the defendants did not know of the forgeries precludes sustaining the indictments upon the theory that the defendants are presumed to have known.

If the defendants certified that they had made an examination which disclosed facts reported, when in fact no such examination had been made, undoubtedly that would constitute a false entry with intent to deceive. The Court of Appeals of our State has recently held in a civil action for fraud and deceit, that fraud may include " the pretense of knowledge when knowledge there is none." (*Ultramares Corporation* v. *Touche*, 255 N. Y. 170.) However, there is no legal evidence before the grand jury that the defendants did not make an examination to secure true information for the reports of April and October, 1929, and April and October, 1930.

The claim most earnestly pressed on the part of the People is, that an indictment under section 304 of the Penal Law may be sustained by evidence that a false statement was made to the State Banking Department because of negligence on the part of the defendants in failing to discover the forgeries. Each of the indictments under consideration contains the following language, " and that the examining committee did not fully examine the books to ascertain the facts." Upon this proposition the attorney for the People cites the case of *People* v. *Mancuso* (255 N. Y. 463).

Of course the court in the *Mancuso Case* (*supra*) was discussing section 297 of the Penal Law. Subdivision 1 of section 297 makes it a misdemeanor for a director to participate in the fraudulent insolvency of a bank and " fraudulent insolvency " is defined as one permitted by lack of " care and diligence." The prevailing opinions in the *Mancuso* case hold that because of the wording of section 297, a director may participate in fraudulent insolvency by negligence. It would seem that the *Mancuso* decision was intended to apply to the particular statute there involved and would not be applicable to a statute in which the element of *scienter* is a requisite. The word " false " as used in section 304 means delib-

erately and knowingly false, and the words "intent to deceive" mean culpable intent — all of which precludes negligence.

These defendants have been indicted under section 297 for negligence in failing to discover and prevent that which they are here indicted for knowing. It would seem that the theory of one of these classes of indictments must fail when applied to the facts.

Having determined that the provision of section 304 of the Penal Law requires evidence before the grand jury of guilty knowledge with culpable intent to deceive, and that these essentials are lacking, it is the duty of this court to grant the motions to dismiss the indictments under said section 304.

It is ordered accordingly.