TRIGO HNOS., INC., and Casera Foods, Inc., Plaintiffs,

v.

PREMIUM WHOLESALE GROCERIES, INC., et al., Defendants.

No. 76 Civ. 2544 (CSH).

United States District Court,
S. D. New York.

July 16, 1976.

Tufo, Johnston & Allegaert, New York City, for plaintiffs.

Lopez & Koppell, New York City, for defendants.

*Memorandum and Order*

HAIGHT, District Judge.

Defendants move pursuant to Rule 64 of the Federal Rules of Civil Procedure and New York Civil Practice Law and Rules ("CPLR") § 6223 for an order vacating a writ of attachment which this Court issued June 29, 1976 upon plaintiffs' *ex parte* application. The main action, charging defendants with breach of contract, monies owing for goods sold and delivered, and fraudulent inducement was initiated June 9, 1976, and the application averred that the writ was authorized by CPLR §§ 6201(4), (5) or (8) [1] in that defendants intended to

1. The relevant provisions, in full text, state:
 "§ 6201. Grounds for attachment
 "An order of attachment may be granted in any action, except a matrimonial action, where the plaintiff has demanded and would

be entitled, in whole or in part, or in the alternative, to a money judgment against one or more defendants, when: . . .
"4. the defendant, with intent to defraud his creditors, has assigned, disposed of or secret-

defraud their creditors, including plaintiffs, through the concealment or improper disposition of their assets and/or because the underlying obligation was incurred through the misrepresentations of the defendants. After the issuance of the writ, the bank accounts of the corporate and individual defendants were attached.

On July 9, a hearing was held pursuant to defendants' motion to vacate, and further papers and evidence submitted. Based upon the record now before the Court, the writ of attachment is vacated for the reasons set forth below.

## I.

Plaintiffs Trigo Hnos., Inc. ("Trigo") and Casera Foods, Inc. ("Casera") are Puerto Rican corporations engaged in the business of packaging and canning of foodstuffs. Subsequent to discussions with Alberto Baez Herrero ("Baez") and Luis Romanach del Valle ("Romanach") in October, 1975, plaintiffs in November, 1975 retained Premium Wholesale Groceries, Inc. ("Premium"), a New York corporation of which Messrs. Baez and Romanach were and continue to be the principal shareholders, directors and operating officers, to distribute its products in the metropolitan area. Premium appears to have successfully marketed a modest shipment of plaintiffs' goods following these initial contacts, and accordingly, it seems that an expansion of the relationship was contemplated. Thus, a contract of exclusive distribution was drafted, though never formally executed, and in December, 1975, plaintiffs extended to Premium $50,000 of unsecured credit.

In January, 1976, plaintiffs' representatives, including a major executive officer, Mr. Dionisio Trigo, met in New York with Messrs. Baez and Romanach, and initiated discussion of plaintiffs' possible acquisition of 50% of Premium's stock. Additionally, according to the undisputed statement of Mr. Romanach, plaintiffs on January 19 "decided to send a massive shipment of goods to Premium in New York" (Romanach Afft. ¶ 11), although it is unclear from the present record at what time this merchandise was actually shipped to and received by the defendants.

It is the concededly unpaid purchase price of these goods, approximately $150,000, which is the subject of the main suit; defendants do not contend that the product was not as warranted, but rather aver that the consignment was intended either as an installment in plaintiffs' purchase of half the outstanding shares of Premium, and as such, an investment in that company, or else as a step aimed at bolstering Premium's financial stature, and maintaining it as a viable entity pending the stock acquisition.

Returning to Puerto Rico, Mr. Trigo contacted his bank, a branch office of The Banco Popular, and requested their aid in ascertaining the financial status of Premium. During a February 3 visit to said bank, he was shown a financial statement of Premium dated June, 1975, together with a covering letter from a C.P.A., certain unaudited financial statements from prior periods, and a memorandum from the United Americas Bank indicating that Premium had outstanding from it a $250,000 long-term loan, and a $75,000 line of credit "for the purpose of letters of credit and acceptance financing."[2] (Trigo Afft. ¶ 6(c)). Mr. Trigo states that copies of these documents, or fair summaries of them, were transmitted to him by the bank, but were lost dur-

---

ed property, or removed it from the state or is about to do any of these acts; or

"5. the defendant, in an action upon a contract, express or implied, has been guilty of a fraud in contracting or incurring the liability; or . . .

"8. there is a cause of action to recover damages for the conversion of personal property, or for fraud or deceit."

2. Although it is not clear from the papers before the Court, it appears that Premium has one outstanding loan from The Small Business Administration, which was originally procured in March, 1972 through The Banco de Ponce in the amount of $75,000. Subsequently, United Americas Bank succeeded to this account, and in November, 1974 and October, 1975, increased the loan.

ing his next trip to New York when his briefcase and its contents were allegedly stolen.

Defendants assert that the revelation of such information violated federal and state banking regulations. Cf. New York General Business Law §§ 370 et seq. However that may be, plaintiffs aver that the effect of this data was to lead them to believe that Premium was in a sound financial position, and to entice them into extending "credit" to Premium, as a result of which they were damaged in an amount equal to the purchase price of the goods previously shipped to Premium. Moreover, plaintiffs contend that the misrepresentations persuaded them to pursue further the proposed partial acquisition of the corporate defendant, as is evidenced by a letter of intent dated February 27, 1976, and signed by both parties. Plaintiffs claim that the favorable impression created by this data was reinforced by direct statements made to its representatives by Mr. Romanach in a meeting between the parties on February 23. Despite plaintiffs' averred belief in the financial health of Premium, it appears that a joint and several guarantee of up to $100,-000 was given Casera by Messrs. Baez and Romanach on March 2, covering Premium's debts and obligations.

On May 3, 1976, Mr. Trigo and other employees of plaintiffs arrived in New York to conclude the final negotiations for the sale of Premium stock. Plaintiffs aver that during a May 4 meeting, Mr. Romanach "admitted" that the financial information set forth in the documents shown to Mr. Trigo by his banker were false (Trigo Afft. ¶ 6), and after a review of Premium's books, voluntarily produced by defendants to plaintiffs' accountants, concluded that Premium was in fact insolvent, with a negative net worth of approximately $200,000. Consequently, plaintiffs ceased the acquisition discussions and instead, produced an instrument which, if signed, would have required defendants to pay for the goods previously provided them by plaintiffs before the end of the month. Defendants refused to sign said agreement, and after several fruitless attempts to resolve these matters, plaintiffs initiated the instant action by filing on June 9, 1976 a complaint containing causes of action based on breach of contract, the personal guarantee and fraudulent inducement. On June 29, this Court issued upon plaintiffs' ex parte application the writ of attachment, which has since been served upon Premium's bank along with the banks utilized by the individual defendants for their personal accounts. By way of an Order to Show Cause dated July 8, defendants brought on the motion to vacate; the parties were heard on July 9, and additional evidence and papers adduced.

## II.

Plaintiffs have predicated their attachment upon CPLR § 6201(4) (intent to defraud creditors through concealment or removal of assets), § 6201(5) (fraudulent inducement of contract) or § 6201(8) (action for fraud or deceit). With regard to § 6201(4), it is more specifically averred that defendants are paying certain "preferred" creditors with the design of excluding plaintiffs from their just compensation, and that such behavior is tantamount to a secretion or improper disposition of assets. Additionally, plaintiffs assert that attachment is warranted under either § 6201(5) or (8) because the underlying contract was fraudulently induced by defendants' false financial statements and because Premium, after having secured credit from the plaintiffs, pledged virtually all its assets to its bank (The United Americas Bank) in exchange for additional financing which would create the appearance that it was a feasible operation, thereby luring unsecured trade creditors such as plaintiffs into dealing with them.

There has been, it is fair to say, a good deal of confusion concerning the question of what burden must be borne by a party seeking to vacate a writ of attachment. In Sugar v. Curtis Circulation Co., 383 F.Supp. 643 (S.D.N.Y.1974), a three judge statutory court found that New York's statutory scheme provided for vacation only when defendant could prove that the provisional

remedy was unnecessary to the security of the plaintiff (i. e., defendant's assets were substantial and permanent enough to insure plaintiff of payment in the event of a judgment favorable to him), or else that the plaintiff's underlying cause of action could not ultimately prevail. The court in *Sugar* held that these requirements placed a burden so heavy upon the party seeking to dissolve the writ that it rendered the necessary post-seizure hearing meaningless, and thus violated the defendant's 14th Amendment right to due process.

Upon review by the Supreme Court, sub nom. *Carey v. Sugar*, 425 U.S. 73, 96 S.Ct. 1208, 47 L.Ed.2d 587 (1976) (44 U.S.L.W. 4416), the New York standards for vacating attachments were held to be sufficiently ambiguous to require that the matter be remanded with instructions to the federal court to abstain from further action pending state court clarification:

> "The precise nature of any inquiry into the merits which will be made by the New York courts under this rubric is unclear, but an inquiry consistent with the constitutional standard is by no means automatically precluded." 425 U.S. at 78, 96 S.Ct. at 1210.

■ Subsequent decisions of the New York State Courts have illuminated this somewhat. It now appears that under CPLR § 6223, any attachment, whether issued for jurisdictional or security purposes, may be vacated upon a showing that it is unnecessary to guarantee plaintiff full payment of the judgment sought[3] or else upon a demonstration that plaintiff cannot succeed.[4] Where, however, the attachment is premised upon the fraudulent intent or deceit of a defendant, the court under New York law has broad discretion to determine whether plaintiff has sufficiently proven the grounds upon which the writ issued.

Thus, in *Regnell v. Page*, 82 Misc.2d 506, 369 N.Y.S.2d 936 (Sup.Ct.N.Y.Co.1975), plaintiffs, as trustees of a workmen's pension fund, had been granted a writ of attachment against defendant-employer on the grounds that the defendant had fraudulently understated its obligations to the fund, and was concealing assets so as to evade payment of a potential judgment against it. In denying the motion to vacate, the court differentiated between the stringent burdens placed upon a non-resident defendant seeking to lift a jurisdictional attachment, and a resident defendant seeking relief from a security attachment premised on a plaintiff's averments of fraud:

> "Moreover, the New York authorities are not so definitive as *Sugar* posits as to the burden of proof, except as to nonresident corporate defendants with only transitory assets in New York, as was the case in the most recent New York decisions cited in *Sugar*. (*Hydromar Corp. of Delaware v. Construction Aggregates Corp.*, 32 A.D.2d 749, 300 N.Y.S.2d 797; *Geo. A. Fuller Co. v. Vitro Corp. of America*, 26 A.D.2d 916, 274 N.Y.S.2d 600.) . . ."
>
> "And in a case more nearly like ours, where the issue is one of fraud and disposition and secretion of assets, and no question of jurisdiction is involved, it has recently been ruled, in vacating an attachment, in *MacMillan, Inc. v. Hafner*, 42 A.D.2d 533, 344 N.Y.S.2d 729:
>
> > 'At best, respondent presented but a scintilla of proof as to the requisite elements of the fraud cause of action alleged in the complaint. Such a perfunctory showing falls far short of the

---

**3.** The record establishes that Premium is a corporation of modest means, and is unable to procure a bond in lieu of the attachment. Indeed, it appears that the company's bank account containing its entire working capital, contained only $7,000 at the time the writ was served, and the combined deposits in the individual defendants' accounts amounted to less than $1,000. Defendants, however, do not advance any argument that the attachment is unnecessary to plaintiffs' security in the sense

that even these attached funds would not be awarded plaintiffs should they prevail, since there are prior, preferred creditors.

**4.** An attachment may also be vacated for failure of the party seeking the provisional remedy to fully comply with the technical requirements of CPLR § 6212, or because the court from whom the writ is sought does not find that plaintiff's papers make out a prima facie case.

requirements to support the drastic remedy of attachment.'" 82 Misc.2d at 510, 511, 369 N.Y.S.2d at 941.

See also *New York Auction Co. v. Belt*, 81 Misc.2d 1032, 1034, 368 N.Y.S.2d 98 (Sup.Ct. N.Y.Co.1975) (distinguishing between the standards of vacatur applicable to security as opposed to jurisdictional attachments).

Plaintiff in *AMF Inc. v. Algo Distributors Co.*, 48 A.D.2d 352, 369 N.Y.S.2d 460 (2nd Dept. 1975) obtained an *ex parte* order of attachment based on its prima facie showing that defendants had converted its property (CPLR § 6201(8)). Although the Appellate Division upheld the lower court's denial of defendant's motion to vacate, the Court stated:

". . . CPLR 6223, as construed by our courts, permits the debtor to immediately attack the validity of the attachment order on a *number* of grounds, including the insufficiency of the creditor's pleadings or cause of action. As we understand this section, broad discretion is given to a judge to vacate an attachment order 'when evidence, though not lacking altogether, may seem too weak or uncertain to justify the remedy' (see *Zenith Bathing Pavilion v. Fair Oaks S.S. Corp.*, 240 N.Y. 307, 313, 148 N.E. 532, 534, supra)." 48 A.D.2d at 361, 369 N.Y.S.2d at 468.

It should be noted that plaintiffs' memoranda in opposition to the motion to vacate do not appreciate the differing standards applied to jurisdictional and security attachments. Indeed, plaintiffs' main reliance is placed upon *American Reserve Ins. Co. v. China Ins. Co.*, 297 N.Y. 322, 79 N.E.2d 425 (1948), a case involving a non-resident defendant, and as such, its holding is inapposite to the case at bar, in which a resident defendant is entitled to challenge the sufficiency of the allegations of fraud upon which the writ was issued.

### III.

▮ Applying this standard to the immediate action, the Court finds that defend-

ants have met their burden of controverting plaintiffs' averments, and have cast the grounds upon which the writ issued into sufficient doubt as to warrant the vacating of the attachment. Viewing in its entirety the evidence submitted on the motion to vacate, I conclude that there is an insufficient showing of the elements of fraud necessary "to support the drastic remedy of attachment."

#### 1. CPLR § 6201(4).

▮ The concealment-improper disposition ground for the attachment may be dealt with summarily; in support of this basis for the writ plaintiffs contend simply that defendants are depleting their assets by making payments to "preferred" creditors with the intent of excluding plaintiffs. Even assuming the truth of the charge, the cases make it evident that such activity is not of the type which CPLR § 6201(4) is designed to safeguard against. Thus, preferential payment to certain creditors, unless part of a larger scheme undertaken with actual intent to defraud creditors, will not suffice to support an attachment. *Merriam v. Wood & Parker Lithographing Co.*, 19 App.Div. 329, 46 N.Y.S. 484 (1st Dept. 1897). Even averments of such a broader scheme are lacking in plaintiffs' papers, and consequently, the writ may not be predicated under this subsection.

#### 2. CPLR §§ 6201(5) and (8).

▮ Moreover, the record as it now exists does not justify an attachment based on plaintiffs' fraud claims (CPLR §§ 6201(5) and (8)), principally for two reasons. First, it does not appear that plaintiffs have averred that they came into contact with the misleading financial statements prior to their making the shipment of goods to defendants, the payment for which is the subject of the main action. Thus, Mr. Romanach makes the uncontroverted statement that it was on January 19 that plaintiffs "decided" to send Premium the substantial shipment at issue (see Romanach Afft. ¶ 11); however, Mr. Trigo states that he

first reviewed Premium's overly-optimistic financial statements on February 3. Consequently, the Court fails to comprehend how the underlying contract, apparently entered into two weeks prior to Mr. Trigo's exposure to Premium's financial statements, could have fraudulently induced him to sell the goods.[5]

The failure of plaintiffs' papers to clarify this problem would, in this Court's view, be sufficient to lift the attachment. However, the result reached here is not predicated on this finding alone. Even assuming that plaintiffs could make out a prima facie case of fraud in that they may have failed to intercept or otherwise terminate the shipment(s) before they reached Premium due to their reliance upon the averred misstatements of defendants, such a theory would nonetheless not entitle them to an attachment under CPLR §§ 6201(5) or (8). This is because the misleading documents exhibited to Mr. Trigo by Banco Popular have not been shown to have been of the type which defendants could reasonably have foreseen being revealed to parties such as plaintiffs.

The Court, of course, fully recognizes the general rule that one making misrepresentations is liable to any party who could reasonably have been expected to have come into contact with such statements; thus, a party furnishing false information to a commercial credit bureau, to an administrative agency or to the public at large, may be held liable by third parties adversely influenced by those misrepresentations, since under familiar principles of law, the speaker should have foreseen reliance by unknown parties upon his statements, *Ultramares v. Touche & Co.*, 255 N.Y. 170, 174 N.E. 441 (1931).

Plaintiffs' reliance on this line of authority, however, is misplaced because there has been no demonstration that the documents shown Mr. Trigo were of the sort which defendants should have foreseen as being made available to plaintiffs. Thus, the allegedly offending documents consist of a "financial statement" dated June, 1975, together with a C.P.A.'s covering letter. Plaintiffs do not intimate that this was a public document, or was one required to be filed so as to allow trade creditors access to its contents. Nor can the "memorandum" from the United Americas Bank, detailing certain facets of their loan to Premium be construed as the type of document which is loosed in the stream of commerce and upon which unsecured and unknowing creditors may foreseeably run aground. Additionally, plaintiffs do not contend that the fact that Premium's loan appears to have some connection with the S.B.A. renders the loan memorandum a public or quasi-public document. Indeed, defendants' repeated assertions that the exhibition of these papers violated banking regulations indicates, at a minimum, their own understanding that the data was confidential. This expectation is substantiated in some degree by the fact that plaintiffs, having lost the initial set of the documents, have not obtained and submitted another set to this Court.

I do not overlook the fact that, in connection with their dealings with the plaintiffs, the defendants gave the United Americas Bank as a credit reference. But it hardly follows from that bare fact that defendants could have anticipated that the financial statements and accountants' covering letter upon which plaintiffs base their allegations of fraud would ever find their way into plaintiffs' hands. The fact of the matter is that plaintiffs did not apply to the United Americas Bank directly for this information, thereby receiving it in accordance with the defendants' authority. On the contrary, the plaintiffs made use of their own

---

**5.** Plaintiffs do aver that misrepresentations were made orally to Mr. Trigo by Mr. Romanach (Trigo Afft. ¶ 6(3)), in late February, approximately three weeks after he first reviewed the written materials at The Banco Popular. Plaintiffs' papers do not specifically allege that any of the shipments in suit were dispatched

by plaintiffs to defendants in reliance upon this particular discussion; and, as we have seen, defendants' uncontroverted evidence is that the agreement to forward the increased quantity of merchandise in question was reached in January.

banking connections in Puerto Rico to obtain the documents and information in question. The defendants say, in their motion papers to vacate the attachment, that the documents in question were obtained, through plaintiffs' bank in Puerto Rico, without either the knowledge or consent of the defendants (Romanach Afft. ¶ 28); and there is nothing in the record to contradict that statement.

In vacating the order of attachment in this case, this Court is following the course charted by Judge Cooper in *In re Panoceanic Tankers Corp.*, 332 F.Supp. 313 (S.D.N.Y. 1971), in which the court stated generally that an order of attachment pursuant to CPLR § 6201(4) is not appropriate "on the basis of the facts before us which fail to satisfactorily establish the requisite 'intent to defraud'" 332 F.Supp. at p. 314. I conclude, in the case at bar, that plaintiffs' evidence of the necessary element of fraud does not rise above the level of a scintilla, if indeed it even attains that inadequate measure.

Consequently, the writ of attachment in this case is vacated. The security given by plaintiffs to procure the attachment shall be continued, pending the application of defendants, if so advised, for an award in their favor for legal costs and damages sustained as the result of the attachment. Such application must be made not later than ten (10) days after entry of this order, failing which the security will be released. I express no view on the merits of such application if subsequently made.

It is So Ordered.