Sidney Squire, J.
This was a joint trial before me in Rochester of these two claims. In Claim No. 58122, the Exchange National Bank of Tampa ("the Bank”), based in the State of Florida, seeks damages of $10,364.24 with interest "for negligence of the State of New York in the issuance of a Certificate of Title to a 1973 Buick automobile * * * to one, Bob Swan * * * without including in said certificate the name of claimant as a lien holder”. In No. 58275, the claim filed by Lou Holtz Buick, Inc. ("Holtz”), a Rochester automobile dealer, demanded $6,975 for substantially the same alleged negligent acts.
The Bank’s claim (verified pleading) was filed herein on January 7, 1974 and served on the Attorney-General on the same day. The Holtz claim was filed herein on March 13, 1974 and served on the Attorney-General on the same day. Each of these acts was timely.
When the respective claims were filed and served, each of the claimants was represented by different Rochester law firms. Upon a subsequent substitution of attorneys, Holtz’s counsel also became attorneys for the Bank. Thus at trial, both claimants were represented by the same law firm.
During the trial, Holtz’s oral motion to amend its claim by adding a demand for interest, was granted by me in open court. A written order thereon was signed and filed in the clerk’s office.
In Ocala, Florida, on June 5, 1973 one Bob Swan had purchased from a Buick dealer, Caviness Motor Company, a new 1973 Buick Riviera for $6,304.24 including a $6 charge for a Florida vehicle registration and a certificate of title.
On the same day in Tampa, Florida, Swan had obtained a loan from the Bank to finance the purchase. His obligation was evidenced by an "instalment note” of that date to the Bank’s order for $7,014.24 payable in 36 successive monthly installments of $194.84 each, beginning July 15, 1973. As collateral security for the debt, Swan simultaneously signed a "security agreement” describing the automobile and the indebtedness, giving the Bank "a security interest” in that vehicle. In the security agreement, Swan specifically promised to keep the Buick, i.e., the "Collateral”, at 6400 - 18th St. *446 North, St. Petersburg, Florida, and not to "remove the Collateral from said state without the written consent of Secured Party” (the Bank).
The Bank’s actual cash advance to Swan ("amount financed”) was $6,000. The remainder of his $7,014.24 obligation consisted of $10.65 for documentary stamps, $10 for "other charges” and $993.59 for "original discount”, i.e., precomputed interest for the 36 months.
Florida was then and has continued to be a vehicle certificate of title ("VCT” or "CT”) State. In due course the Florida VCT for Swan’s Buick was issued on June 26, 1973 and sent to the Bank, the lien holder. The certificate showed "Registered Owner (last name, first) swan bob 6400 18 st n st pete fl”; and "1st LIEN HOLDER EXCHANGE BANK P O BOX 3304 TAMPA FL 33601”, opposite which there were entered, under "date”, "06/05/73” and under "amount of lien”, "$7,014.24”.
Swan did not possess the Florida CT. That was kept by the Bank. The only evidence that Swan had was a "vehicle invoice” from the dealer. On the invoice there were typewritten a description of the Buick, the purchase terms, and alongside of the heading (misspelled) "Lein” (i.e., Lien), there was "Exchange Bank of Tampa $7014.24”.
Swan drove the Buick to Rochester, New York, some time before July 12, 1973. On that day he appeared at the Auto License Bureau ("the Auto Bureau”) in the Monroe County Clerk’s office and made a written application on the defendant’s Department of Motor Vehicles ("DMV”) form MV-82TD for a New York registration and a New York CT. The form served for both purposes although entitled in the alternative "application for registration or title” (emphasis supplied).
The New York State Uniform Vehicle Certificate of Title Act (Vehicle and Traffic Law, tit X, art 46) had been enacted by chapter 1134 of the Laws of 1971, to become effective on July 1, 1972 and to be applicable to vehicles beginning with those manufactured on or after July 1, 1972 and designated as a 1973 model (§ 2102, subd [a], par [10]). The provisions thereof applied to Swan’s 1973 Buick automobile.
The MV-82TD application form required that 14 numbered items be filled in by Swan. No. 3 was for his street address, No. 4, his city, State and zip code, and No. 5, his county of residence. As filled in, the entries for Nos. 3, 4 and 5 were: "6400 18th St. No., St. Pete Fla. 33702 Pinellas”. Other *447 numbered entries gave details of the automobile and insurance.
Above Nos. 13 and 14 there appeared in solid capital letters: "FOR 1973 AND NEWER VEHICLES, COMPLETE ITEMS 13 AND 14.” No. 13 asked whether the "Vehicle Was Purchased” used or new. No. 14 had four lines for the applicant to insert: "First Lienholder’s Name (if none — enter 'None’)”, the "Lien Date” and the "Mailing Address” as to number and street, city, State and zip code of the first lien holder. Identical details were to be supplied as to a second lien holder. Immediately below these four lines for No. 13 and No. 14, at the bottom of the page there were printed in even larger solid capital letters: "be sure to complete form and sign the other side.” (Nothing on the form was in larger characters than the said admonition at the bottom of the page.) Nevertheless, Swan did not fill in anything for Nos. 13 and 14. All of the said lines remained blank.
On the face of that form there was a right-hand column headed "this column for office use only”. About three quarters of the page down, among other printed abbreviations there was the printed letter "L”. That letter was a symbol for "Lien”. Around the "L” the Auto Bureau clerk had drawn a circle to denote that the item had received her attention. Alongside of the "L” she wrote "O”, i.e., zero. The lady testified before me that her zero near to the "L” meant "no lien”.
On the reverse side of that form, Bob Swan signed his certification to the defendant’s department:
"I. I CERTIFY THAT:
"1. The information given on this application is true.”
Annexed to his application, Swan submitted only the Florida dealer’s invoice of June 5, 1973. Based on that (and the requisite taxes, fees and proof of insurance coverage), on said July 12, 1973 the Auto Bureau issued and handed to Swan at the County Clerk’s office, a State of New York registration and plates for the Buick. This was done without the submission of a Florida CT by Swan.
The next step was the transmittal of the approved application form and supporting documentation from Rochester to the title bureau of the defendant’s DMV in Albany (L 1971, ch 1134, § 3, amdg Vehicle and Traffic Law, § 205; 15 NYCRR 20.7). Within that bureau there was the screening and control *448 section. Its function was to examine and approve the submitted evidence of ownership and status as to any liens. If any proof were defective or insufficient, the set of papers became "a pullout”, and was referred to the department’s title services section for review and disposition. (The prescribed procedures for handling rejected applications included notification to [a] the applicant or [b] an erroneously omitted lienholder or [c] both, as the situation required.)
In the processing of Bob Swan’s application, there was no "pullout”. The DMV employees at Albany overlooked or disregarded the typewritten legend on the submitted "vehicle invoice” which clearly disclosed that there was a "lein” [sic] held by "Exchange Bank of Tampa” for "$7014.24”. Moreover, the DMV should have insisted upon the production of a Florida CT because our State’s DMV knew that Florida was a VCT State. Never was there a question raised because Items 13 and 14 were blank and there was no "none” inserted in No 14.
On August 10, 1973 the defendant’s DMV in Albany issued to Swan its VCT. It was a "clean” certificate, i.e., certifying that there was no lien on the Buick automobile.
Armed with that "clean” certificate, the "Bob Swan caper” continued smoothly albeit dishonestly. In Rochester on September 12, 1973, Swan spoke with Holtz’s used car department manager about a sale of the Buick. On the following morning, September 13, 1973, after a series of offers and counteroffers a deal was made for $4,300.
Swan signed a mimeographed bill of sale form dated that day. The form contained Swan’s "guarantee that this car * * * is entirely free from any lien or encumbrance and that clear title is in my nay [sic] ” Swan received the $4,300 Holtz check and handed to Holtz his New York CT after signing the "Transfer by Owner” portion on the reverse side. That signed form similarly contained Swan’s express representation that the vehicle was free of any lien. Holtz placed the Buick on its used car lot for sale.
Meanwhile, Swan had made three payments of $194.84 each to the Bank for July, August and September. He did not pay the installment due on October 15, 1973 or any subsequent one.
In November, 1973, Swan appeared at the Bank and reported that he had sold the Buick to Holtz. Thereupon the Bank’s lawyers on November 24, 1973 made formal written *449 demand on Holtz to return the Buick. Within a week, Holtz’s lawyers notified the Bank’s counsel that Holtz would not surrender the vehicle because it claimed superior right thereto based on the "clean” New York CT.
There then ensued the following administrative and judicial proceedings on or about the following dates:
December 6, 1973: The Bank filed a notice of lien with the DMV;
January 9, 1974: The Bank began an action against Holtz in the Supreme Court of the State of New York, Monroe County, in which the complaint demanded return of the vehicle or alternatively, $10,000 damages;
January 24, 1974: The DMV at the conclusion of that day’s hearing in Rochester to determine whether the New York CT had been "fraudulently procured”, issued an order revoking the certificate as "erroneously issued”. Holtz immediately surrendered the certificate to the hearing examiner.
Then the pending Supreme Court action was settled. On February 13, 1974, the Bank and Holtz stipulated to a discontinuance with prejudice (CPLR 3217). They exchanged releases. In substance, Holtz acknowledged the Bank’s superior right and tendered the Buick to it. The Bank obtained a Florida repossession CT but instead of returning the Buick to Florida, sold it to Holtz in Rochester for $3,500. The Bank transferred its said CT to Holtz. On February 21, 1974, Holtz sold the Buick for $4,500 to a customer.
Upon the foregoing facts, I find that the defendant breached its separate duty to each of the claimants, that it was negligent, that its negligence was the proximate cause of loss to each claimant, and that neither claimant was contributorily negligent.
Defendant’s counsel ingeniously contends that the only negligence proven at bar was that of the employees in the Auto Bureau at the Monroe County Clerk’s office. This tactic would derail the primary factual issue before me, to wit, the DMV negligence at Albany. During the first three days of trial, claimants’ trial counsel unequivocally stated "that the negligence was in Albany, not in Rochester”. On the fourth day of trial, claimants moved to amend their causes of action to allege negligence by those county clerk employees at Rochester. Claimants’ trial counsel had discovered that section 205 of the Vehicle and Traffic Law declares that the Monroe *450 County Clerk was the agent of the DMV commissioner. The motion was vigorously opposed by the Assistant Attorney-General, emphasizing that the State had prepared its defense predicated on the pleadings, bills of particulars and statements of the adversary counsel summarized as "the negligence was in Albany, not in Rochester”. I denied the motion.
The Auto Bureau in the county clerk’s office did not have authority to issue any VCT. Its ultimate function was to issue drivers’ licenses, automobile plates and owners’ registrations therefor. Only the Albany office of the DMV could issue a VCT. In article 46, section 2105 of the Vehicle and Traffic Law directs that when an application for a first certificate of title (as at bar) is made to the DMV for a "vehicle last previously registered or licensed in another state”, the applicant must submit the "certificate of title issued by the other state”. Bob Swan did not do this but the defendant permitted him to "get away with it”.
As heretofore stated, Swan did not have the Florida CT. The Bank had it, as an incident of its security. Even if Swan could have obtained it and then presented it in our State, it would have clearly shown that the Bank had a lien. This would have thwarted Bob Swan’s nefarious intention.
The Uniform Vehicle Certificate of Title Act had been passed to prevent chicanery such as was perpetrated by Bob Swan in this case. The regulations (15 NYCRR) of the defendant’s DMV are denominated somehow "Regulations of the Commissioner” or "Commissioner’s Regulations”. Section 20.7 of the regulations (15 NYCRR 20.7) concisely provides that an application for title is to "be forwarded to the title bureau which will examine all pertinent documents, and if the documents are proper and sufficient, the title bureau shall issue a certificate of title (Form MV-999) to the owner of the vehicle.” The next sentence is crucial at bar. It directs that "If the vehicle was last titled in another State, a certificate of title (Form MV-999) will be issued only when the original out-of-State title document is surrendered.” Here, that Florida "title document” was not "surrendered” to the New York DMV. This reflects the defendant’s lack of due diligence.
The defendant knew or should have known that the VCT which it issued would be relied on in the regular course of business. The failure of the defendant to comply with its own section 20.7 of DMV regulations (15 NYCRR 20.7), is evidence of its negligence. Aside from the knavery of Bob Swan, the *451 VCT could never have been issued to him without the negligence of the defendant’s employees. Such negligence was an essential ingredient of the mischief which ensued.
The Appellate Division, Fourth Department, in Sexstone v City of Rochester (32 AD2d 737) declared: "Since there was a duty to issue the certificate in a careful manner with knowledge that the plaintiffs would rely thereon, the city should be liable for the negligent issuance, if such was the case. (Glanzer v. Shepard, 233 N. Y. 236; Ultramares Corp. v. Touche, 255 N. Y. 170.) This act did not involve discretion, and the municipality is liable for its wrongful action in issuing it. (Bernardine v. City of New York, 294 N. Y. 361, 365.)”
(To similar effect are Hartwell v Riley, 47 App Div 154; Cole v Vincent, 229 App Div 520; 49 NY Jur, Records and Recording Acts, § 60; 55 NY Jur, State of New York, § 201; see, also, Cardozo, J., in Glanzer v Shepard, 233 NY 236, 239-240.)
The defendant’s posture that each of the claimants was contributorily negligent, is not valid on the facts and law at bar. The Bank’s extension of credit to Bob Swan is not properly an issue before me. We are concerned only with the loan’s collateral, i.e., the Buick automobile. As for Holtz, the defendant’s reliance on Paglia v State of New York (278 App Div 281, affd 303 NY 303 NY 82Í) is misplaced. That case was predicated on a 1948 occurrence, about 25 years before the Uniform Vehicle Certificate of Title Act was in force. Paglia pertained to a registration certificate, not a VCT. The opinions of the Appellate Division Justices reviewed the distinctions clearly. At bar, the defendant issued a "clean” CT on which Holtz rightfully relied. A registration certificate, as in Paglia and even today, has nothing to do with any lien on a vehicle. A VCT does.
The respective losses sustained by the claimants were proximately caused by the negligence of the defendant. Neither of the claimants was contributorily negligent.
Attention is now given to the damages at bar. They differ considerably as to the respective claimants.
The Bank seeks $10,364.24, its entire alleged loss resulting from its loan to Bob Swan secured by the latter’s Buick. The sum appears to consist of the unpaid balance of the loan plus expenditures for the repossession of the vehicle.
There are differing situations to be considered. Legally, we cannot equate (a) the Bank’s cause of action against Bob *452 Swan, with (b) the Bank’s claim at bar against the State of New York. During the trial it was stated that the Bank had obtained a money judgment against Bob Swan and that the same is unpaid. In and of itself, this does not mean that the defendant herein is liable to the Bank for said amount. I am persuaded that the defendant’s liability is much less.
Swan was liable on his "instalment note”, a contractual obligation, whereas the defendant’s liability is a tortious one, for negligence. Although this was not briefed by counsel, it is my opinion that a significant distinction must be recognized. The damages suffered by the Bank through Swan’s contractual default are not identical with the Bank’s damages flowing from the defendant’s negligence. The facts must be considered in assaying the quantum of the State’s liability to the Bank.
The genesis of the "Bob Swan caper” was his $6,304.24 new Buick purchase on which he paid only $304.24 in cash from his own pocket plus the $6,000 proceeds of his $7,014.24 bank loan payable monthly for three years. Swan’s dishonesty in disposing of the Buick adversely affected the Bank’s lien on its collateral. In banking language, when Swan sold the Buick to Holtz, the loan was "decollateralized”. When that occurred on September 13, 1973, the $4,300 sales price was its market value.
It took five months for the Bank to regain its collateral. In the intervening period of time, Swan’s 1973 Buick had become that much older and the 1974 models were on the market. On or about February 13, 1974, the Buick was sold by the Bank to Holtz for $3,500, the market value at that time. The difference between the $4,300 and the $3,500 is $800, the Bank’s general damages. In addition thereto, it should recover the reasonable value of applicable counsel fees and lawyers’ disbursements.
On the trial it was demonstrated that not all of the $1,650 fee was directly attributable. It is my determination that the pertinent lawyers’ fees were of the reasonable value of $1,481.25 to which there are added disbursements of $65.65, for a total of $1,546.90, the Bank’s special damages. The $800 and $1,546.90 total $2,346.90, the Bank’s damages for which it is entitled to a judgment against the defendant.
Holtz has lost the entire $4,300 which it paid to Swan for the Buick on September 13, 1973. What occurred five months later does not legally affect the foregoing. In February of 1974 Holtz repurchased the Buick from the Bank and then resold it for a larger sum. That was adventitious and not legally *453 related to the quantum of damages at bar. (Cf. Kaufman v Gordon, 12 AD2d 586, affd 10 NY2d 769; Gusikoff v Republic Stor. Co., 241 App Div 889; Hanover Shoe v United Shoe Mach. Corp., 185 F Supp 826, affd 281 F2d 481, cert den 364 US 901, reh den 364 US 939; Cereal Byproducts Co. v Hall, 16 Ill App 2d 79, affd 15 Ill 2d 313; Fruehauf Trailer Co. v Lydick, 325 Ill App 28.)
Holtz is entitled to the legal fees directly resulting from the "Bob Swan caper” but not for the institution and prosecution of the claim at bar, as requested in the Holtz claim and amended claim verified on October 24, 1975. The reasonable value of the legal fees for which the defendant is liable, is $939.50 (to February 26, 1974) plus the law firm’s disbursement of $157.55 for the official stenographic transcript of the hearing in the DMV. Thus these special damages are $1,097.05 and are added to the general damages of $4,300 for a total of $5,397.05 which Holtz is entitled to recover from the defendant.
The two claims are grounded in negligence. Recovery for personal injuries in a negligence case does not carry interest. The law is not the same when the negligence relates to the deprivation or other interference with possession, enjoyment or title to property (CPLR 5001). The Bank and Holtz are entitled to interest on the principal amounts of their recoveries.
After trial, extensive posttrial briefs were received. None of the parties submitted a reply posttrial brief although time therefor had been given. The case was finally submitted on January 29, 1976. Additional legal research was done by me.
Motions upon which decisions were reserved including motions to dismiss made during trial and at the close of the entire case, are not denied.
All parties having waived the submission of proposed decisions, the clerk of this court is directed to enter separate judgments herein against the defendant, the State of New York, as follows:
1. In Claim No. 58122: In favor of the Exchange National Bank of Tampa, claimant, for $2,346.90, with interest thereon from February 13, 1974 to the date of entry of judgment herein; and
2. In Claim No. 58275: In favor of Lou Holtz Buick, Inc., claimant, for $5,397.05, with interest on $4,300 thereof from *454 September 13, 1973 and on $1,097.05 thereof from February 26, 1974, both to the date of entry of judgment herein.